# Illinois Official Reports

## Appellate Court

---

### *In re J.H.*, 2020 IL App (4th) 200150

---

| | |
|---|---|
| Appellate Court Caption | *In re* J.H., a Minor (The People of the State of Illinois, Petitioner-Appellee, v. Shalyn M., Respondent-Appellant).–*In re* K.H., a Minor (The People of the State of Illinois, Petitioner-Appellee, v. Michael H., Respondent-Appellant). |
| District & No. | Fourth District<br>Nos. 4-20-0150, 4-20-0151 cons. |
| Filed | August 3, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Macon County, Nos. 18-JA-160; 18-JA-161; the Hon. Thomas E. Little, Judge, presiding. |
| Judgment | No. 4-20-0150, Reversed.<br>No. 4-20-0151, Affirmed. |
| Counsel on Appeal | Monica Hawkins, of Decatur, for appellants.<br><br>Jay Scott, State's Attorney, of Decatur (Patrick Delfino and David J. Robinson, of State's Attorneys Appellate Prosecutor's Office, of counsel, and Leslie N. Martin, law school graduate), for the People. |

Panel            JUSTICE CAVANAGH delivered the judgment of the court, with opinion.
Presiding Justice Steigmann and Justice DeArmond concurred in the judgment and opinion.

## OPINION

¶ 1      We have consolidated two appeals from the termination of parental rights. One appeal is by Shalyn M., the father of J.H., who was born on September 12, 2014. The other appeal is by Michael H., the father of K.H., who was born on September 26, 2011. Although J.H. and K.H. have different fathers, they have the same mother. The mother, who voluntarily surrendered her parental rights to the two children, does not appeal. But the fathers, the respondents, Shalyn M. and Michael H., do appeal. They contend that, in arriving at the decision to terminate their parental rights, the circuit court of Macon County made findings that were against the manifest weight of the evidence. Specifically, respondents challenge the court's findings that (1) they are unfit to have children and (2) terminating their parental rights would be in the best interests of their respective daughters, J.H. and K.H.

¶ 2      The circuit court's findings against Michael H. are not against the manifest weight of the evidence. By finding Shalyn M., however, to be unfit to have a child, the court made a finding that was against the manifest weight of the evidence. Therefore, in case No. 4-20-0150, we reverse the judgment against Shalyn M., but in case No. 4-20-0151, we affirm the judgment against Michael H.

¶ 3                         I. BACKGROUND

¶ 4          A. The Motions for the Termination of Parental Rights

¶ 5      On July 31, 2019, the State filed motions to terminate respondents' parental rights (as well as the mother's parental rights but, as it turned out, she voluntarily surrendered her parental rights before the best-interest hearing). The State made the same four allegations against both respondents, that is, against both fathers.

¶ 6      First, the State alleged that respondents had "failed to maintain a reasonable degree of interest, concern, or responsibility as to the minor's welfare." See 750 ILCS 50/1(D)(b) (West 2018).

¶ 7      Second, the State alleged that respondents had "failed to make reasonable efforts to correct the conditions that were the basis for the removal of the minor from the parent during any [nine-]month period following the adjudication of neglect." See *id.* § 1(D)(m)(i).

¶ 8      Third, the State alleged that, during the nine-month period of August 30, 2018, to May 30, 2019, respondents "failed to make reasonable progress toward the return of the minor to the parent." See *id.* § 1(D)(m)(ii).

¶ 9      Fourth, the State alleged that, during the nine-month period of October 29, 2018, to July 29, 2019, respondents "failed to make reasonable progress toward the return of the minor to the parent." See *id.*

## B. The Parental Fitness Hearing

¶ 11   On January 27, 2020, the circuit court held an evidentiary hearing on the issue of whether the parents of J.H. and K.H. met the statutory definitions of an "unfit person" that the State cited in its motions for the termination of their parental rights (see *id.* § 1(D)(b), (D)(m)(i), (D)(m)(ii)). The witnesses in the hearing testified substantially as follows. (We have omitted most of the evidence pertaining to the mother since she is not a party to these appeals.)

### 1. *The Testimony of Antoinette Dawson*

¶ 13   Antoinette Dawson was a case aide at Webster-Cantrell Hall in Decatur, Illinois. She supervised the mother's visits of J.H. and K.H. and Shalyn M.'s visits of J.H.

¶ 14   Dawson had observed the mother's visits for about a year. Initially, when visits were weekly, the mother's attendance was unreliable. Her attendance improved somewhat after the visitation schedule was changed to once a month instead of every week. Some days the medication the mother was taking rendered her unable to attend. And when the mother showed up for visitation, the medication tended to make her doze off.

¶ 15   Shalyn M.'s visits with J.H. went better. He brought books and read to J.H. He taught her the alphabet and how to tie her shoes. He never let her eat candy or drink pop. He did well in visitations—but afterward he went to prison, and Dawson saw no more of him.

¶ 16   Dawson never knew K.H.'s father, Michael H. He never visited K.H.

### 2. *The Testimony of Mary Mescher*

¶ 18   Mary Mescher was assigned the cases of J.H. and K.H. in October 2018 and had been their court-appointed special advocate ever since then.

¶ 19   Mescher supervised the mother's visitations. Something about the dosage of methadone the mother was taking made her prone to fall asleep, even while she was standing up. Mescher was afraid that, during visits, the mother might fall on J.H.

¶ 20   There had been no visitation between Michael H. and K.H. But K.H. once remarked that she had received a letter from Michael H. The context of the remark was a conversation between J.H. and K.H. about their both having fathers who were in prison.

¶ 21   Mescher herself had never observed any of the visits between Shalyn M. and J.H. But those visits, by Mescher's understanding, had been going well. Shalyn M. had been visiting J.H. every week, and he was being considered for extended visitation, depending on whether he got his legal problems cleared up. In early 2019, he was even being considered as a possible return-home placement. Then, in March 2019, Shalyn M. was sentenced to imprisonment.

### 3. *The Testimony of Matthew Stymets*
#### a. His Testimony Regarding Michael H.

¶ 24   Matthew Stymets, a foster-care caseworker at Webster-Cantrell Hall, had been assigned the cases of J.H. and K.H. since February 2019. Not long after Stymets took over these cases from a previous caseworker, he received two letters from Michael H., who was incarcerated in Florida. One letter was addressed to him, Stymets. The other letter was addressed to K.H. Stymets wrote back to Michael H., informing him that K.H. was healthy and happy in her foster home. The letter to K.H., her counselor reported back, was upsetting to K.H. because she barely knew Michael H. and was afraid he would come to Illinois and take her with him to

Florida. In September 2019, Michael H. sent K.H. a birthday card. The previous caseworker, the one preceding Stymets, had received one letter, or perhaps two letters, from Michael H. As for Stymets, the letter to him and the letter to K.H. were the only two letters he had received from Michael H. since February 2019, when Stymets took over the case. Stymets had never set up any phone calls with Michael H. Nor had he ever heard of any instances when Michael H. spoke with K.H. by phone.

¶ 25    Because the contact from Michael H. had been so sparse, he was never added to the service plans. To Stymets's knowledge, Michael H. had never received any services in Florida. But Stymets had never asked him about services, nor had Stymets recommended any. Having never observed Michael H. with K.H., Stymets could not say, one way or the other, whether Michael H. would be able to fulfill his parental responsibilities.

¶ 26    By Stymets's understanding, Michael H. would be released from the Florida correctional system in 2021.

¶ 27                    b. Stymet's Testimony Regarding Shalyn M.

¶ 28    In the service-plan evaluation of January 2019, Shalyn M. received a rating of satisfactory. When he was incarcerated in approximately April 2019, the only services remaining for him were visitation and random drug-testing. Before being incarcerated, however, Shalyn M. completed a substance-abuse assessment, and the determination from the assessment was that he needed no substance-abuse services. When Shalyn M. went to jail, visitation ceased. But before going to jail, he was receiving overnights and weekends with J.H. He was doing well until his legal problems flared up.

¶ 29    The prosecutor asked Stymets:

> "Q. When [Shalyn M.] was incarcerated in the jail, did he have visits over the—over the phone?
>
> A. At the time, visitation was offered, but I believe they were—he—he—we were told that he did not want visitation."

After April 2019, when he went to prison, Shalyn M. had no further in-person contact with J.H. although he spoke with her by phone "a handful of times," as Stymets put it.

¶ 30    Despite the determination from the substance-abuse evaluation that Shalyn M. needed no substance-abuse services, it was in his service plan that he continue undergoing random drug-testing, just as it was in his service plan that he continue visiting J.H. But there had been no drug-testing or in-person visitation since he was incarcerated.

¶ 31    Stymets agreed that Shalyn M. was not the reason why J.H. came into care. Instead, there were (unspecified) issues with the mother. Shalyn M. participated satisfactorily in services throughout the case. In fact, as of March 2019, Stymets had no concerns at all about him. The only thing that was still hanging out there, as of March 2019, was the criminal case. Shalyn M. was doing well with weekend visits and was having good interactions with J.H. And, in fact, by March 2019, he was being considered for a return-home placement once his legal status was clear. The trouble was, after a brief stay in the Macon County jail, he was sentenced in April 2019 and went straight to prison. His expected parole date was in February 2022. (Stymets also testified that it was in 2021.)

¶ 32    Ever since Shalyn M. went to the Illinois Department of Corrections, Stymets had never sent him any letters or gone to the prison to see him. Once, Stymets attempted to speak with

Shalyn M. by phone, but when Stymets went into his office, the call never came through. Stymets was made aware, through Shalyn M.'s attorney, that there was difficulty getting the connection to go through to Webster-Cantrell Hall. Stymets also attempted to speak with Shalyn M.'s counselor at the Illinois Department of Corrections but could never get anyone there to return his message. That was the counselor's fault, Stymets admitted, not Shalyn M.'s fault. Stymets had sent no correspondence to Shalyn M. in prison. Shalyn M. participated, by phone, in an annual case review while he was incarcerated, but Stymets could not recall, one way or the other, whether visitation was discussed.

¶ 33    Someone had told Stymets that Shalyn M. "would not want visits in jail." Stymets had never heard that directly from Shalyn M.—and Stymets had never asked Shalyn M. himself whether he wanted visitation in jail. Stymets could not remember for sure who had told him that Shalyn M. wanted to forgo jail visitation, but he thought it was "the foster parents." At no time did Stymets attempt to arrange for visits while Shalyn M. was incarcerated.

¶ 34    On cross-examination, Stymets was asked if he was aware that Shalyn M. had been telephoning J.H. during his incarceration:

"Q. Are you aware that [Shalyn M.] has been maintaining phone contact with [J.H.]?

A. Yes.

Q. Are you aware it's weekly communication?

A. Yes."

(This was despite Stymets's earlier testimony, on direct examination, that Shalyn M. had spoken with J.H. by phone only "a handful of times" after he was incarcerated.) Stymets also was aware that, while incarcerated, Shalyn M. had been using family members to send packages to J.H.—items such as clothing and toys—and that Shalyn M. had proposed arranging a guardianship with one of his own family members, an idea the agency had rejected out of an unwillingness to separate the children.

¶ 35    One of the periods during which Shalyn M. allegedly failed to make reasonable progress was August 30, 2018, to May 30, 2019. In the opinion of Stymets, though, Shalyn M. made reasonable progress from August 30, 2018, through April 2019. Of that nine-month period, it was only April 2019, the month of Shalyn M.'s admission to the Illinois Department of Corrections, that was problematic in Stymets's thinking.

¶ 36    The other period during which Shalyn M. allegedly failed to make reasonable progress was October 29, 2018, to July 29, 2019. But his progress from October 29, 2018, to April 2019 was, in Stymets's estimation, reasonable.

¶ 37    Defense counsel asked Stymets:

"Q. When [Shalyn M.] is released from prison, you wouldn't have any additional services for [him] to complete; is that correct?

A. I would probably ask him to re-do a substance abuse assessment just on the grounds that that was what the charge was for.

Q. All right. But once he completed that, would he again be a suitable placement for [J.H.]?

A. Um, we would have to observe [J.H.] with him again.

Q. But there are no other concerns that have arisen in the last few months that cause you concern?

A. No."

¶ 38 On redirect examination, the State asked Stymets:

"Q. Was there any initial problem with placing [J.H.] with [Shalyn M.], due to his criminal history?

A. I was not made aware of his criminal history until after he had already been arrested, or charged, I should say.

Q. So you didn't know what his background—

A. No.

Q. —included?

A. (Shook head in the negative.)

Q. Had you known that, would the visits with [J.H.] been allowed?

A. A visitation would have still been allowed; however, we probably would not have gone all the way doing weekend visits at that time until the criminal charges were cleared up."

¶ 39 At the conclusion of the parental fitness hearing, the circuit court found Dawson, Mescher, and Stymets to be credible witnesses. According to Dawson, Shalyn M. had done well in visitation. According to Stymets, Shalyn M. "was rated [as] overall satisfactory in [the] first [s]ervice [p]lan." Stymets "plainly testified that [Shalyn M.] had overnight and extended weekend visitations" and that, "overall[,] he was doing well." But subsequently, in April 2019, Shalyn M. went to prison, whereupon his in-person visitation with J.H. ceased. The court continued: "With respect to [Shalyn M.], he would not be released until sometime next year. So again, Mr. Stymets testified that he did not believe that [Shalyn M.] could be considered realistically a fit parent within the next six to nine months."

¶ 40 As for Michael H., Stymets "had no observations of [him] with the child, so [Stymets] really couldn't say one way or the other, but it [was] clear that [Michael H.] ha[d] not performed any requirements." In closing arguments, the guardian *ad litem* "ha[d] pointed out that[,] apparently[,] [Michael H.] was not involved in the [s]ervice [p]lan." Even so, the circuit court reasoned, "the fact that [Michael H. was] incarcerated apparently [was] due to his own devices."

¶ 41 The circuit court found, by clear and convincing evidence, that respondents were "unfit persons" within the meaning of each subsection of section 1(D) of the Adoption Act (*id.* § 1(D)) that the State had cited in its motions for the termination of parental rights. (The court found the mother to be an "unfit person," too, for the reasons the State had alleged.)

¶ 42 Specifically, as to respondents, the fathers, the circuit court found as follows.

¶ 43 First, the circuit court found, by clear and convincing evidence, that Shalyn M. and Michael H. "ha[d] failed to maintain a reasonable degree of interest, concern, or responsibility as to the minor's welfare." See *id.* § 1(D)(b).

¶ 44 Second, the circuit court found, by clear and convincing evidence, that Shalyn M. and Michael H. "ha[d] failed to make reasonable efforts to correct the conditions that were the basis for the removal of the minor from the parent during any [nine-]month period following the adjudication of neglect." See *id.* § 1(D)(m)(i).

¶ 45    Third, the circuit court found, by clear and convincing evidence, that Shalyn M. and Michael H. "ha[d] failed to make reasonable progress toward the return of the minor to the parent during" the nine-month period of August 30, 2018, to May 30, 2019. See *id.* § 1(D)(m)(ii).

¶ 46    Fourth, the circuit court found, by clear and convincing evidence, that Shalyn M. and Michael H. "ha[d] failed to make reasonable progress toward the return of the minor to the parent during" the nine-month period from October 29, 2018, to July 29, 2019. See *id.*

¶ 47                        C. The Best-Interest Hearing
¶ 48                        1. *The Testimony of Matthew Stymets*
¶ 49    The two children had been in relative foster care since 2018, when the case began. The foster mother is their maternal grandmother, who would like to adopt them. She provides for the children's needs, and they are close to her and to one another.

¶ 50    K.H. was enrolled in school. J.H. was in preschool and would be starting kindergarten in the fall of 2020.

¶ 51    The assistant state's attorney asked Sytmets:

> "Q. Do they have family events? You said this is a relative foster placement. Do they have family events that the children know wider family members?
>
> A. The children are familiar with other family members. However, from my understanding, there aren't a lot of family gatherings."

¶ 52    On cross-examination, Shalyn M.'s attorney asked Stymets:

> "Q. Are you aware that since the fitness hearing that the foster mother has been avoiding contact with [Shalyn M.'s] family?
>
> A. I was not aware of that."

¶ 53    Shalyn M.'s attorney also asked Stymets:

> "Q. The only issue you've ever had with [Shalyn M.] has been the incarceration; correct?
>
> A. That's correct.
>
> Q. Otherwise, he wasn't required to do any services; right?
>
> A. He was required to do a substance abuse assessment and some drug drops.
>
> Q. And that was fine?
>
> A. And he came back fine, yes.
>
> Q. And, in fact, he was going to be the presumptive placement; right?
>
> A. Yes.
>
> Q. And that was up until his incarceration?
>
> A. Yes."

Stymets admitted that the charges for which Shalyn M. ultimately was incarcerated predated J.H.'s present case.

¶ 54    Shalyn M.'s attorney also asked Stymets:

> "Q. In talking with the adoptive placement, the foster mother's had some health issues. Is that accurate?
>
> A. That is accurate.

Q. What kind of health issues has she had?

A. She has been diagnosed with multiple sclerosis. However, she frequently sees her doctor. She's been given an excellent bill of health and frequently attends all of her checkups.

Q. Does the multiple sclerosis diagnosis make it difficult for her to perform certain tasks when it comes to the children?

A. I have never observed her having any issues with the children.

Q. And let's talk about housing as well. Would it be accurate to say that the foster mother has moved around quite a bit?

A. She has moved a few times.

Q. Maybe about five times?

A. Since I got the case, I would say twice.

Q. And that's since you've had the case?

A. Uh-huh.

Q. Is that a yes?

A. Yes.

Q. And were you aware that the foster mother would seek financial support from [Shalyn M.'s] family?

A. Yes.

Q. And is she still intending to rely on that support going forward?

A. She has indicated she would like to have as much support from his side of the family as she could. However, if we were to go through with the adoption, she would also be eligible for a subsidy through [the Illinois Department of Children and Family Services (DCFS)] which would help her care for the children."

¶ 55 Finally, Shalyn M.'s attorney asked Stymets about the conference call he had with Shalyn M.:

"Q. Since [Shalyn M.] has been incarcerated, you've had pseudo contact with him one time. Is that correct?

A. Yes.

Q. And that was—I believe it was a phone conference?

A. Yes.

Q. And there were multiple people on the line?

A. I believe it was—would have been myself, [Shalyn M.], and one of the DCFS screeners.

Q. And during that phone call, do you remember [Shalyn M.] specifically requesting visits?

A. I do not recall."

¶ 56                                    *2. The Testimony of Shalyn M.*

¶ 57 In the best-interest hearing, though not in the preceding parental fitness hearing, Shalyn M. testified on his own behalf. (By this observation, we do not mean to imply that Shalyn M. was required to prove anything in either hearing.) Much of his testimony in the best-interest

hearing, however, had to do with his fitness to raise J.H. The time for giving that testimony would have been in the parental fitness hearing instead of in the best-interest hearing. Therefore, we have tried to limit our summary of Shalyn M.'s testimony to the parts that seem relevant to the question of J.H.'s best interests. (And, to be clear, in addressing the issue of Shalyn M.'s parental fitness, we are considering none of his testimony in the best-interest hearing.)

¶ 58    After the State rested in the best-interest hearing, Shalyn M. took the stand in his own behalf. He testified in substance as follows.

¶ 59    He was J.H.'s father and was serving a prison sentence after being convicted of charges that predated this case. He had been approved, however, for work release. He would receive two six-hour passes throughout the week. These weekly passes would enable him to resume in-person visitation with J.H. Although he had a release date of 2021, he expected the date would be much earlier as a result of his being approved for work release.

¶ 60    Ever since he was incarcerated in the midst of this case, Shalyn M. had maintained contact with J.H. until the last hearing, the hearing in which the circuit court found him to be an unfit person. After that hearing, the maternal grandmother, whose first name was Angela, suddenly cut all ties with Shalyn M.'s family. Shalyn M. testified:

> "[Angela] said she was keeping [J.H.] that weekend, and my mother tried to reach out to her because they had been doing weekends still visits, and ever since the so-called verdict came down, she haven't allowed contact, phone call-wise or visits.
>
> Q. And you said that's for your family. Is that for you as well?
>
> A. Yes.
>
> Q. You attempted to make phone calls?
>
> A. Yes, I attempted to reach out.
>
> Q. But no response?
>
> A. No. And actually sent messages through trying to smooth things over, whatever, however she's feeling, trying to figure out what's going on.
>
> Q. All right.
>
> A. And she actually hung up on my family the last attempt."

¶ 61    This, Shalyn M. testified, was despite the fact that Shalyn M.'s family had been providing Angela with financial assistance, not only for J.H. but also for K.H.—and his family intended to continue doing so. Angela had been moving from residence to residence because of her on-and-off relationship with her significant other. Beyond J.H., K.H., and their mother, Angela had no family. Her father and her brother had passed away. But J.H. had an extended family on her father's side. Shalyn M. testified:

> "Yes, I have family that she['s] already close to. I also have an aunt that can provide, she has a daycare, so everything that she needs—childcare, transportation, clothing, housing, stable housing is there with my family. So I know the State is going to view however they want to view, but at the end of the day when you wake up tomorrow, just remember that the best interest would be for the child, not for kicking another case through court."

¶ 62    This case was, Shalyn M. observed, the second or third time the two children had been in care through DCFS. There was DCFS involvement from 2016 to 2018, after which the children

were returned home. Then, a few months later, in 2018, the children came back into care a third time. Shalyn M. testified:

> "[J.H. is] my baby. I've been there since day one when she was born ***. I went over to the Carle Center because she was born with heroin in her system, so I've been fighting this since day one.

> * * *

> Q. And do you think that, due to your work release, you will be able to provide stability and permanency for her in the near future?
> A. Yes."

¶ 63 At the conclusion of the best-interest hearing, the circuit court found, by a preponderance of the evidence, that terminating the parental rights of Shalyn M. to J.H. would be in her best interest and that terminating Michael H.'s parental rights to K.H. would be in her best interest. Accordingly, the court terminated respondents' parental rights to their daughters.

¶ 64 These appeals followed.

¶ 65 ## II. ANALYSIS

¶ 66 ### A. The Findings That Respondents Were "Unfit Persons"

¶ 67 There are two steps to the involuntary termination of parental rights. First, the State must prove, by clear and convincing evidence, that the parent is an "unfit person" as defined in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2018)). 705 ILCS 405/2-29(2) (West 2018); *In re M.I.*, 2016 IL 120232, ¶ 20. If the State proves that the parent meets one of the definitions of an "unfit person" in section 1(D), the circuit court will hold a subsequent and separate hearing, in which the State must prove, by a preponderance of the evidence (*In re D.T.*, 212 Ill. 2d 347, 367 (2004)), that the proposed termination of parental rights would be in the child's best interests. 705 ILCS 405/2-29(2) (West 2018); *M.I.*, 2016 IL 120232, ¶ 20.

¶ 68 When a parent appeals the circuit court's findings that he or she is an "unfit person" and that terminating parental rights is in the best interests of the child, we do not retry the case but, instead, limit ourselves to deciding whether the court's findings are against the manifest weight of the evidence. *In re A.W.*, 231 Ill. 2d 92, 104 (2008); *In re Austin W.*, 214 Ill. 2d 31, 51-52 (2005). This is a deferential standard of review. A finding is against the manifest weight of the evidence only if the evidence "clearly" calls for the opposite finding (*In re Daphnie E.*, 368 Ill. App. 3d 1052, 1072 (2006)), such that "no reasonable person" could arrive at the circuit court's finding on the basis of the evidence in the record (*Prater v. J.C. Penney Life Insurance Co.*, 155 Ill. App. 3d 696, 701 (1987)).

¶ 69 Therefore, we will begin by considering whether it is clearly evident, from the evidence in the record, that the State failed to carry its burden of proof. In other words, is it clearly evident that the State failed to prove, by clear and convincing evidence, that respondents met any one of the four definitions of an "unfit person" cited in the motions to terminate their parental rights? See *In re A.J.*, 269 Ill. App. 3d 824, 828 (1994).

¶ 70 ### 1. *Michael H.*

¶ 71 In its motion to terminate Michael H.'s parental rights, the State alleged that he was an "unfit person" within the meaning of section 1(D)(b) of the Adoption Act (750 ILCS 50/1(D)(b) (West 2018)) in that he had "failed to maintain a reasonable degree of interest,

concern, or responsibility as the to the minor's welfare," to quote from the motion. The "minor," of course, was Michael H.'s daughter, K.H. Under section 1(D)(b) of the Adoption Act, one of the "grounds of unfitness" is a "[f]ailure to maintain a reasonable degree of interest, concern[,] or responsibility as to the child's welfare." *Id.*

¶ 72    In deciding whether a parent's interest in, concern for, and responsibility toward the child's welfare have been reasonable in degree, the circuit court should consider the parent's efforts to visit the child and to otherwise maintain contact with the child, as well as the parent's inquiries into the child's welfare. *Daphnie E.*, 368 Ill. App. 3d at 1064. The court should consider such efforts in the circumstances in which they were made, taking into account any obstacles to visiting the child. *Id.* If circumstances make personal visitation impractical, the court should consider the extent to which the parent showed reasonable interest, concern, and responsibility by other means, such as letters, telephone calls, and gifts to the child, "taking into account the frequency and nature of those contacts." *Id.*

¶ 73    Michael H.'s imprisonment in Florida made personal visits between him and K.H. impractical. The question, then, was whether he demonstrated a reasonable degree of interest, concern, and responsibility by other means, such as by letters, telephone calls, and gifts to K.H. and by inquiries about her welfare. See *id.* It appears, from the evidence in the parental fitness hearing, that Michael H. showed *some* interest in, concern for, and responsibility toward K.H.'s welfare. In the period of February 2019 to January 2020, he sent a letter to Stymets, a letter to K.H., and a birthday card to K.H. But that was it for a period of almost a year. Not every fair-minded person would regard those communications as frequent enough to be objectively reasonable in degree. See 750 ILCS 50/1(D)(b) (West 2018); *Daphnie E.*, 368 Ill. App. 3d at 1064; *Prater*, 155 Ill. App. 3d at 701. It is telling that when K.H. received the letter from Michael H., she panicked at the imagined prospect of being removed from Illinois and taken to Florida by someone who was a stranger to her. By finding that Michael H. had failed to show a reasonable degree of interest, concern, or responsibility as to K.H.'s welfare, the circuit court did not make a finding that was against the manifest weight of the evidence. See *A.W.*, 231 Ill. 2d at 104.

¶ 74    Because meeting only one of the statutory definitions in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2018)) is enough to make the parent an "unfit person," we need not discuss the remaining unfitness allegations against Michael H. See *In re F.P.*, 2014 IL App (4th) 140360, ¶ 83.

¶ 75    We turn now to the unfitness case against Shalyn M.

¶ 76                                   *2. Shalyn M.*

¶ 77                    a. His Alleged Failure to Maintain a Reasonable Degree of
                         Interest, Concern, or Responsibility as to J.H.'s Welfare

¶ 78    The circuit court found that Shalyn M. had "failed to maintain a reasonable degree of interest, concern, or responsibility as to the minor's welfare," to quote from the court's order. See 750 ILCS 50/1(D)(b) (West 2018). This finding is against the manifest weight of the evidence. See *A.W.*, 231 Ill. 2d at 104.

¶ 79    At the parental fitness hearing, the State presented only three witnesses in support of its petition that alleged Shalyn M. was an unfit parent, and most of that testimony was not

unfavorable toward him. Indeed, but for Shalyn M.'s incarceration in April 2019, this record contains almost no basis to conclude that Shalyn M. was an unfit parent.

¶ 80 For instance, we note that the prosecutor referred to Shalyn M.'s incarceration at closing argument and simply noted that "he cannot take custody at this point." Similarly, the circuit court noted that Stymets testified that Shalyn M. was doing well prior to his incarceration in April 2019. The court further noted that, although Shalyn M. will be released in 2021, Stymets did not believe Shalyn M. could be realistically considered a fit parent for at least another six to nine months after the termination hearing.

¶ 81 The State's brief on appeal similarly points only to Shalyn M.'s incarceration and the fact that he will not be released from prison until 2021 as being essentially the only ground in support of the circuit court's ruling. Shalyn M.'s incarceration (which should last less than a year) is not enough, given the other factors, upon which to base a determination that he is an unfit parent.

¶ 82 Other evidence of Shalyn M.'s parental unfitness could conceivably have been offered (based upon evidence presented at permanency review hearings and the dispositional hearing), but it was not. Thus, we are forced to evaluate the sufficiency of the State's evidence based solely upon what was presented at the fitness hearing—and it is not sufficient.

¶ 83 B. The Finding That It Would Be in K.H.'s Best
Interests to Terminate Michael H.'s Parental Rights

¶ 84 Michael H. challenges the circuit court's finding that terminating his parental rights to K.H. would be in her best interests. He argues:

> "With regard to Michael, it would not be in the best interests to terminate his parental rights. He has written K.H. letters which shows his desire to remain in her life. It would be in the best interests of K.H. to grow up with her father who loves her and has fought for her. It was against the manifest weight of the evidence for the court to find that it was in the best interests of the child to terminate the parental rights of Michael, and its decision should be reversed."

¶ 85 Michael H. has accurately identified our standard of review. The question for us is whether, in finding that it would be in K.H.'s best interests to terminate Michael H.'s parental rights, the circuit court made a finding that was against the manifest weight of the evidence. See *In re B.B.*, 386 Ill. App. 3d 686, 697 (2008). The finding is against the manifest weight of the evidence only if it is "clearly evident" that the State failed to carry its burden of proof, namely, the burden of proving, by a preponderance of the evidence, that terminating Michael H.'s parental rights would be in K.H.'s best interests. *Id.* at 697-98. In other words, we should deem the finding to be against the manifest weight of the evidence if the finding is "unreasonable, arbitrary, or not based on the evidence presented." *Id.*

¶ 86 Was the circuit court's best-interest finding as to K.H. a reasonable, nonarbitrary, evidence-based application of the best-interest factors in section 1-3(4.05) of the Juvenile Court Act of 1987 (705 ILCS 405/1-3(4.05) (West 2018))? Considering that the foster parent is willing to adopt K.H. (see *In re Tashika F.*, 333 Ill. App. 3d 165, 170 (2002)), several of those factors arguably weigh in favor of terminating Michael H.'s parental rights and thereby making the adoption possible. For example, K.H. is attached to the foster parent but not attached, apparently, to Michael H. See 705 ILCS 405/1-3(4.05)(d) (West 2018). Michael H. insists that

he loves K.H., but the question is "where the child actually feels love, attachment, and a sense of being valued (as opposed to where adults believe the child should feel such love, attachment, and a sense of being valued)." *Id.* § 1-3(4.05)(d)(i). K.H.'s sense of security and familiarity are in the foster home, as vividly demonstrated by her fear of being uprooted from that home and being moved to Florida with someone whom she did not know. See *id.* § 1-3(4.05)(d)(ii), (iii). Her need for permanence arguably would be best served by allowing her to remain with her maternal grandmother, with whom she has lived since 2018. See *id.* § 1-3(4.05)(g). For all those reasons, we are unable to say that the circuit court's best-interest determination regarding K.H. is against the manifest weight of the evidence. See *B.B.*, 386 Ill. App. 3d at 697.

¶ 87                                    III. CONCLUSION

¶ 88        For the foregoing reasons, we reverse the judgment against Shalyn M. in case No. 4-20-0150, but we affirm the judgment against Michael H. in case No. 4-20-0151.

¶ 89     No. 4-20-0150, Reversed.

¶ 90     No. 4-20-0151, Affirmed.