2021 IL App (1st) 200596-U

FOURTH DIVISION
March 25, 2021

No. 1-20-0596

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE APPELLATE COURT
OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| *In re* K.G., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Cook County |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | No. 12 JA 755 |
| v. | ) | |
| | ) | |
| K.S., | ) | Honorable |
| | ) | Kimberly Lewis, |
| Respondent-Appellant). | ) | Judge Presiding. |

_____

JUSTICE REYES delivered the judgment of the court.
Presiding Justice Gordon and Justice Martin concurred in the judgment.

**ORDER**

¶ 1    *Held*:   Affirming the judgment of the circuit court of Cook County finding the natural father to be unfit where the State established by clear and convincing evidence that he failed to make reasonable progress toward reunification with his child during a nine-month period following an adjudication of abuse or neglect.

¶ 2    Respondent K.S. is the natural father of minor K.G.  In an adjudication order entered in 2013, K.G. was found to be abused or neglected.  The State subsequently filed a petition to terminate respondent's parental rights based on his failure to make reasonable progress toward

the return of K.G. during the nine-month period following the adjudication order, pursuant to section 1(D)(m)(ii) of the Adoption Act (750 ILCS 50/1 *et seq.* (West 2018)). The circuit court of Cook County found respondent to be unfit and determined that it was in K.G.'s best interest for respondent's parental rights to be terminated. Respondent argues on appeal that the circuit court erred in finding him to be unfit; he does not challenge the "best interest" determination. He contends that the unavailability of services during his incarceration for approximately eight months of the applicable nine-month period – and his progress prior to and during incarceration – precludes a finding of unfitness. For the following reasons, we affirm.

¶ 3                                    BACKGROUND

¶ 4      After K.G. was born on October 24, 2011, he resided with his natural mother, S.G.; respondent resided separately. In a petition for adjudication of wardship filed on July 25, 2012, the State alleged that K.G. was neglected due to an injurious environment (705 ILCS 405/2-3(1)(b) (West 2012)) and abused due to a substantial risk of physical injury (705 ILCS 405/2-3(2)(ii) (West 2012)). The petition provided, in part, that: S.G. had two other children who were in the custody of the Department of Children and Family Services (DCFS); S.G. had been diagnosed with impulse control disorder, mood disorder, and borderline intellectual functioning; an intact case was opened on June 1, 2012, to offer services to the family; and K.G.'s "care plan disrupted" on July 23, 2012. The petition further alleged that DCFS had assessed respondent's residence and found it to be inappropriate. The circuit court granted temporary custody to the DCFS Guardianship Administrator, and K.G. was placed with a foster parent, A.J.

¶ 5      Based on a stipulation of facts entered into the record, the circuit court entered an adjudication order on March 11, 2013, finding K.G. to be abused or neglected based on an injurious environment and a substantial risk of physical injury. The adjudication order noted that

respondent was non-custodial.  In a disposition order entered on April 15, 2013, the circuit court found that S.G. and respondent were each unable for some reason to care for, protect, train, or discipline K.G.; the child was placed with the DCFS Guardianship Administrator.  As the case continued in the years that followed, K.G. remained with his foster parent, A.J.

¶ 6     On July 24, 2018, the State filed a petition for termination of parental rights and for the appointment of a guardian with the right to consent to adoption.  The State alleged, in pertinent part, that respondent and S.G. were unfit in that they failed to make reasonable efforts to correct the conditions which were the basis for K.G.'s removal from them and/or failed to make reasonable progress toward the return of K.G. to them within nine months after the adjudication of abuse or neglect under the Juvenile Court Act and/or within any nine-month period after such finding, in violation of section 1(D)(m) of the Adoption Act (750 ILCS 50/1(D)(m) (West 2018)) and section 2-29 of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-29 (West 2018)).  The State further asserted that K.G.'s foster parent wished to adopt him, and that such adoption was in the child's best interest.

¶ 7     K.G.'s natural mother S.G. ultimately relinquished her parental rights and consented to his adoption by his foster parent.  The allegations of unfitness were withdrawn as to S.G., and she is not a party to the instant appeal.  As to respondent, the State narrowed its allegations to solely the nine-month period following the adjudication order, *i.e.*, March 11, 2013 to December 11, 2013.  Three witnesses testified at the hearing to determine whether respondent was unfit:  Evelyn Johnson, Tara Lampkin, and respondent.

¶ 8     Respondent's witness Evelyn Johnson (Johnson),[1] the former executive director of the "New Beginning" agency, testified that respondent participated in a 15-hour program of

---

[1] Due to availability issues, the witnesses testified out of order.

observed parent-child interaction with K.G. The program provided parenting and life skills training, *e.g.*, respondent learned about healthy snacks and discipline techniques. The record includes a certificate of completion dated March 26, 2013. On cross-examination, Johnson confirmed that respondent still needed to complete "a lot of services" after the New Beginning program. She also testified that while respondent had participated in seven and one-half two-hour weekly sessions, only three sessions occurred after March 11, 2013, *i.e.*, during the relevant nine-month period.

¶ 9    The State called Tara Lampkin (Lampkin), the case manager in 2013 and 2014. She testified that respondent was incarcerated in the Cook County jail after the adjudication order. The record indicates that respondent was incarcerated from April 7, 2013 to March 25, 2014 and was charged with manufacture/delivery of cannabis, 30 – 500 grams. Lampkin spoke with him twice during his incarceration when he had been transported to the juvenile court for hearings in this case. Although respondent indicated he was engaged in services at the jail, neither he nor his attorney provided documentation regarding the completion of any such services.

¶ 10    When questioned regarding the barriers faced by workers in offering services to incarcerated parents, Lampkin responded, in part, that the process is "challenging" and that "[y]ou have to work with the counselor." According to Lampkin, an outside service provider cannot physically enter the Cook County jail. Lampkin testified that the services are limited to what is available in a particular correctional facility, and it was respondent's responsibility to seek out services while incarcerated. She confirmed that she would not have been permitted to allow unsupervised day or night visits or the return of K.G. during respondent's incarceration. When asked to characterize the progress made by respondent during the nine months after the adjudication order, she responded that "[t]here was no progress."

¶ 11    During cross-examination, Lampkin was questioned regarding notes in a July 23, 2013 DCFS service plan which she had authored. While she had rated respondent's participation as "satisfactory" for a number of services, the record indicates that certain services were completed prior to the relevant nine-month period. One of the services that respondent had not completed was a psychological evaluation. The service plan rated respondent's progress as to this service as "unsatisfactory" since he "failed to keep the schedule[d] appointment and was later arrested." Lampkin did not know whether the jail offered this service but testified that respondent was supposed to speak with his counselor "to get it for him."

¶ 12    Lampkin testified she had spoken with respondent's jail caseworker, but she could not recall the exact timing or details of the conversations, and she did not memorialize the conversations. Lampkin further testified that respondent had participated in services and visits with K.G. and had made substantial progress prior to his incarceration in April 2013.

¶ 13    The State's exhibits included DCFS integrated assessments dated July 31, 2012 and January 9, 2013, and DCFS family service plans dated July 23, 2013 and June 20, 2014. After the State rested, respondent filed a motion for a directed finding. Respondent, who is African-American, contends his equal protection and due process rights were violated based on racial disparities in the enforcement of drug offenses and that the trend both nationally and in Illinois is toward the decriminalization of marijuana. Respondent further asserted that the State did not present sufficient evidence to support its allegation of failure to make reasonable progress where it did not establish that services were available during his incarceration and where he had made progress prior to his incarceration and was willing to continue with services upon his release. The State and K.G.'s guardian *ad litem* opposed the motion, arguing that the evidence demonstrated that respondent had failed to make reasonable progress during the applicable nine-

month time frame. The circuit court denied respondent's motion for a directed finding.

¶ 14    Respondent testified that the only services provided to him during his incarceration were through West Care, a drug treatment program. According to respondent, "someone put [him] in" West Care. The record indicates that respondent was admitted to the West Care pre-release center for a 130-day program on November 15, 2013, which he completed in late March 2014. Respondent testified that, if services would have been provided in jail, he would have participated in them.

¶ 15    During cross-examination, respondent was asked whether he had been told by the court that he needed to speak to his social worker or other jail personnel to inquire about available services. Although respondent's answer was unclear, he appears to have testified that he was only informed of the availability of a counselor – and received his psychological evaluation – at the end of his incarceration.

¶ 16    On October 29, 2019, the circuit court entered an order finding that respondent was unfit pursuant to section 2-29 of the Juvenile Court Act (705 ILCS 405/2-29 (West 2018)) and section 1(D) of the Adoption Act (705 ILCS 50/1(D) (West 2018)) based on "no reasonable progress" from March 11, 2013 to December 11, 2013.[2] In its oral ruling, the circuit court acknowledged that respondent had completed certain services during the nine-month period, *i.e.*, the parenting program in March 2013 and his participation in the West Care program on and after November 15, 2013. The circuit court found, however, that "largely due to his incarceration," respondent was not able to be properly assessed, to engage in services including a

---

[2] Although the circuit court found that the State met its burden to prove by clear and convincing evidence that respondent failed to "make reasonable progress toward the return of the child" (750 ILCS 50/1(D)(m)(ii) (West 2018)) during the applicable nine-month period, the court found that the State did not meet its burden to prove that respondent failed to "make reasonable efforts to correct the conditions that were the basis for the removal of the child" (750 ILCS 50/1(D)(m)(i) (West 2018)).

mental health assessment, to have visitation with K.G. "where he could demonstrate his ability to execute parental responsibilities," or to obtain stable housing.

¶ 17 During the "best interests" hearing, K.G.'s foster mother A.J. testified, in part, that she had cared for him for more than seven years and had adopted his biological sister. Caseworker Maleta Portillo testified that the relationship between A.J. and K.G. was "very natural, nurturing, and healthy." Dr. Sweety Agrawal – a psychologist who completed a parent capacity assessment for respondent – testified regarding certain "risk factors" with respect to respondent, including his inability to obtain or maintain stable housing. She also expressed concern regarding respondent's interaction with K.G. during a visit she observed, *i.e.*, respondent was unable to engage with or soothe K.G. Respondent testified, in part, that he resided with his girlfriend and her children in Rockford, Illinois, beginning in November 2018 and was able to visit K.G. by a two-hour bus ride. His income is provided through social security payments.

¶ 18 On December 13, 2019, the circuit court involuntarily terminated respondent's parental rights based on the finding of unfitness and the best interest of K.G. The circuit court ordered that the appropriate permanency goal is adoption by A.J. The court denied respondent's motion to reconsider, and respondent filed this timely appeal.

¶ 19 ANALYSIS

¶ 20 Respondent argues on appeal that the circuit court erred in finding that he was an unfit parent due to a failure to make reasonable progress toward the return home of K.G. The State and K.G.'s attorney each challenge this contention and ask this court to affirm the judgment.

¶ 21 As a preliminary matter, we observe that this is an accelerated appeal pursuant to Illinois Supreme Court Rule 311(a) (eff. July 1, 2018), which addresses the disposition of child custody and related appeals. Rule 311(a)(5) provides that an appellate court shall issue its decision

within 150 days after the filing of the notice of appeal "[e]xcept for good cause shown." *Id.* As the notice of appeal was filed on April 6, 2020, the 150-day period expired on September 3, 2020. However, respondent requested and was granted three extensions of time for filing his opening brief. Upon inquiry by this court, respondent's counsel confirmed on December 9, 2020 that no reply brief would be filed. Based on the foregoing, we find that good cause is shown for the delay in filing this disposition. *In re Keyon R.*, 2017 IL App (2d) 160657, ¶ 1, n.1; *In re B'yata I.*, 2013 IL App (2d) 130558, ¶ 26. We thus turn to the merits.

¶ 22    The authority to terminate parental rights is found in the Juvenile Court Act and the Adoption Act. *In re J.L.*, 236 Ill. 2d 329, 337 (2010). Section 2-29 of the Juvenile Court Act delineates a two-step process for the involuntary termination of parental rights. 705 ILCS 405/2-29 (West 2018). See also *J.L.*, 236 Ill. 2d at 337; *Keyon R.*, 2017 IL App (2d) 160657, ¶ 16. The court must first hold an evidentiary hearing to determine whether the parent is unfit. *In re M.A.*, 325 Ill. App. 3d 387, 390 (2001). See also *In re D.T.*, 212 Ill. 2d 347, 352 (2004) (noting that "[g]enerally, under the Juvenile Court Act, where a child is adjudicated abused, neglected or dependent, and the State seeks to free the child for adoption, unless the parent consents, the State must first establish that the parent is 'unfit' under one or more of the grounds set forth in the Adoption Act"). If the trial court finds the parent to be unfit, then the court determines whether the termination of the parent's rights is in the minor's best interest. *Id.*; *M.A.*, 325 Ill. App. 3d at 390; 705 ILCS 405/2-29(2) (West 2018). As respondent's arguments on appeal are limited to the unfitness finding, any arguments regarding the "best interest" determination have been forfeited and shall not be addressed herein. Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (stating that "[p]oints not argued are forfeited").

¶ 23    The State was required to establish by clear and convincing evidence one ground of

parental unfitness from those enumerated in section 1(D) of the Adoption Act. 750 ILCS 50/1(D) (West 2018); *In re Je. A.*, 2019 IL App (1st) 190467, ¶ 47; *Keyon R.*, 2017 IL App (2d) 160657, ¶ 16. See also *In re D.D.*, 196 Ill. 2d 405, 417 (2001) (noting that "[w]hen deciding a parent's fitness, the court is not to consider the best interests of the child but, rather, must focus on whether the parent's conduct falls within one or more of the several 'grounds of unfitness' described in section 1(D) of the Adoption Act"). "Each case concerning parental unfitness is *sui generis*, unique unto itself." *In re Adoption of Syck*, 138 Ill. 2d 255, 279 (1990).

¶ 24    When a parent appeals the circuit court's unfitness finding, we do not retry the case; our review is limited to whether the finding is against the manifest weight of the evidence. *In re J.H.*, 2020 IL App (4th) 200150, ¶ 68. A decision is against the manifest weight of the evidence where the opposite result is clearly evident from the record. *Je. A.*, 2019 IL App (1st) 190467, ¶ 46. See also *Keyon R.*, 2017 IL App (2d) 160657, ¶ 16 (noting that a decision is against the manifest weight of the evidence "only if the opposite conclusion is clearly apparent or the decision is unreasonable, arbitrary, or not based on the evidence"). "A trial court's finding of unfitness is afforded great deference because it has the best opportunity to view and evaluate the parties and their testimony." *In re Gwynne P.*, 346 Ill. App. 3d 584, 590 (2004), *aff'd*, 215 Ill. 2d 340 (2005). See also *In re T.B.*, 215 Ill. App. 3d 1059, 1062 (1991).

¶ 25    This appeal involves a finding of unfitness based on section 1(D)(m)(ii) of the Adoption Act, which provides that a parent's failure to make reasonable progress toward the return of the child during any nine-month period following the adjudication of abuse or neglect is a ground of unfitness. 750 ILCS 50/1(D)(m)(ii) (West 2018). The State proceeded as to the nine-month period immediately following the adjudication order, from March 11, 2013 to December 11, 2013. Therefore, we must consider whether it is clearly evident that the State failed to prove, by

clear and convincing evidence, that respondent was an "unfit person" pursuant to section 1(D)(m)(ii) based on his failure to make reasonable progress toward K.G.'s return during the foregoing time frame. See *J.H.*, 2020 IL App (4th) 200150, ¶ 69.

¶ 26 "Reasonable progress exists when the trial court can conclude that progress being made by a parent to comply with directives given for the return of the minor is sufficiently demonstrable and of such a quality that the trial court will be able to order the minor returned to parental custody in the near future." *In re D.T.*, 2017 IL App (3d) 170120, ¶ 17. Accord *In re F.P.*, 2014 IL App (4th) 140360, ¶ 88; *In re D.H.*, 323 Ill. App. 3d 1, 9 (2001). In determining whether a parent has made reasonable progress, a court is to consider evidence occurring only during the applicable nine-month period mandated in section 1(D)(m). *J.L.*, 236 Ill. 2d at 341. See also *Je. A.*, 2019 IL App (1st) 190467, ¶ 72 (noting that services completed by the parent outside of the nine-month time frame were irrelevant to the court's analysis of his unfitness). " 'Reasonable progress' is an objective standard that is not concerned with a parent's individual efforts and abilities." *In re Nevaeh R.*, 2017 IL App (2d) 170229, ¶ 21.

¶ 27 In the instant case, respondent was incarcerated for approximately eight months of the relevant nine-month period. While "[t]he mere fact of incarceration is not evidence of failure to make reasonable progress," time spent in prison is included in the nine-month period during which reasonable progress must be made. *Id.* Our supreme court has made clear that incarceration does not toll the nine-month period and that the statute does not provide any exception for incarcerated parents. *J.L.*, 236 Ill. 2d at 341-42.

¶ 28 The services recommended through DCFS for respondent included a psychological evaluation. Lampkin indicated that respondent had made "unsatisfactory progress" with respect to participation in a psychological evaluation since he missed a scheduled appointment and was

subsequently arrested. During the circuit court hearing regarding unfitness, Lampkin testified that it was respondent's responsibility to seek out services while incarcerated. While the record suggests that respondent may have inquired regarding a mental health assessment in October 2013, the record does not establish that respondent actually participated in such an assessment during the nine-month period. A family service plan prepared in June 2014 indicated that respondent stated that he had completed a psychological evaluation while incarcerated, but neither he nor his counsel provided a copy of any evaluation to Lampkin. Although respondent attempts to minimize the importance of the evaluation – and speculates regarding its availability during the relevant time frame – a DCFS service plan "is an integral part of the statutory scheme for measuring progress toward the goal of reunification of the parent and child." *Neveah R.*, 2017 IL App (2d) 170229, ¶ 23. Respondent's failure to timely comply with this service is not consistent with "measurable or demonstrable movement toward the goal of reunification." *Je. A.*, 2019 IL App (1st) 190467, ¶ 62.

¶ 29    As did the circuit court, we recognize that respondent engaged in a parenting program during the first few weeks of the relevant nine-month period. The record suggests, however, that any progress due to his participation in the program may have been "impeded by the setback of his incarceration." *Id.* ¶ 68. Among other things, Lampkin testified that respondent's incarceration precluded any unsupervised visitation with K.G. While the mere fact of respondent's incarceration was not evidence of failure to make reasonable progress, his apparent decision to engage in criminal conduct while his child was in DCFS custody is not indicative of reasonable progress toward K.G.'s return. *M.A.*, 325 Ill. App. 3d at 392. See also *In re Reiny S.*, 374 Ill. App. 3d 1036, 1046 (2007) (finding that the respondent's continued use of illegal drugs and repeated illegal activity evidenced the "opposite" of reasonable progress).

¶ 30    When issuing its ruling regarding unfitness, the circuit court also expressly acknowledged respondent's participation in the West Care program during the last few weeks of the nine-month period.  The circuit court nevertheless found that defendant failed to make reasonable progress, *i.e.*, measurable or demonstrable movement toward the goal of reunification with K.G. in the near future.  See *Je. A.*, 2019 IL App (1st) 190467, ¶ 62.  Among other things, the court found that – primarily due to his incarceration – respondent's ability to visit and bond with K.G., to be properly assessed for services, and to secure stable housing had been impaired.  As noted above, we are limited to deciding whether this ruling was against the manifest weight of the evidence – a deferential standard of review which recognizes the circuit court's superior position to observe the witnesses, assess their credibility, and weigh the evidence.  *J.H.*, 2020 IL App (4th) 200150, ¶ 68; *T.B.*, 215 Ill. App. 3d at 1062.  Based on our review of the record, we cannot conclude that the circuit court's ruling was against the manifest weight of the evidence.

¶ 31    The cases involving incarcerated parents relied upon by respondent are not persuasive. For example, the appellate court in *Keyon R.* reversed the judgment of the circuit court terminating the respondent's parental rights where the State failed to prove unfitness.  *Keyon R.*, 2017 IL App (2d) 160657, ¶ 34.  Unlike the instant case, however, DCFS had "predetermined" that the respondent was unfit and refused to assess him or to give him a service plan.  *Id.* ¶ 32.  In *J.H.*, the appellate court found that the State had not met its burden during the fitness hearing. *J.H.*, 2020 IL App (4th) 200150, ¶ 82.  The *J.H.* appellate court noted that the foster-care caseworker had opined that the respondent had made reasonable progress during the majority of the two relevant nine-month periods.  *Id.* ¶¶ 35-36.  Conversely, caseworker Lampkin testified that respondent made "no progress" during the applicable period, the substantial majority of which he was incarcerated.  Furthermore, the analysis in *J.H.* was focused on an unfitness

ground under section 1(D) of the Adoption Act other than "reasonable progress." *Id.* ¶¶ 76-82. The appellate court in *Gwynne P.* held the circuit court's finding that the respondent failed to make reasonable progress was against the manifest weight of the evidence. *Gwynne P.*, 346 Ill. App. 3d at 596. Noting that the respondent "took several steps" toward completing the services in her service plan, including her "persistent efforts" to schedule visits with her child during the relevant nine-month period, the appellate court held that she "made a minimum measurable or demonstrable movement toward reunification." *Id.* at 595-96. Not only was the progress made by respondent herein substantially less than in *Gwynne P.*, but also the appellate court therein arguably applied an incorrect definition of "reasonable progress." *E.g.*, *F.P.*, 2014 IL App (4th) 140360, ¶ 88 (noting that "[i]f all a parent had to do was to make 'a minimum measurable or demonstrable movement toward reunification,' it could be years before the parent was prepared for reunification"). We further note that the *Gwynne* appellate court affirmed the circuit court's finding of unfitness based on another statutory ground, and our supreme court affirmed this judgment. *In re Gwynne P.*, 215 Ill. 2d 340, 363 (2005). Respondent's reliance on the foregoing cases is unavailing.

¶ 32 For the reasons discussed above, the circuit court's finding that respondent was unfit pursuant to section 1(D)(m)(ii) of the Adoption Act (750 ILCS 50/1 *et seq.* (West 2018)) was not against the manifest weight of the evidence.

¶ 33                                         CONCLUSION

¶ 34 The judgment of the circuit court of Cook County is affirmed in its entirety.

¶ 35 Affirmed.