NOTICE
Decision filed 02/23/22. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2022 IL App (5th) 210325-U

NOS. 5-21-0325, 5-21-0326 cons.

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| *In re* T.B. and A.B., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Union County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | Nos. 18-JA-47 & 18-JA-48 |
| | ) | |
| C.L., | ) | Honorable |
| | ) | William J. Thurston, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

JUSTICE CATES delivered the judgment of the court.
Justices Welch and Moore concurred in the judgment.

**ORDER**

¶ 1   *Held*:   Mother's appeal from the dispositional order was not timely filed and the trial court's decision finding Mother to be an unfit parent was not against the manifest weight of the evidence.

¶ 2   Respondent, C.L. (Mother), appeals the judgment of the circuit court of Union County terminating her parental rights to her minor children, T.B. and A.B. Mother additionally appeals the order of disposition. For the following reasons, we affirm in part and dismiss in part.

1

¶ 3                                I. BACKGROUND

¶ 4     T.B., born on February 20, 2012, and A.B., born on April 23, 2013, are the biological

children of Mother. Hollis B. (Father) married Mother after T.B.'s birth.[1] On November 1, 2018,

a call was made to the Illinois Department of Children and Family Services (DCFS) alleging

frequent physical and emotional abuse to T.B. and A.B. It was also alleged that the children were

not in a safe environment due to drug use by the parents. Their house was filthy and frequently

without utilities. The neighbors would feed the children. Mother and Father would lock the

children out of the house and leave the children home alone for extended periods of time.

¶ 5     On November 6, 2018, the State filed petitions for adjudication of wardship for both T.B.

and for A.B. alleging that they were neglected pursuant to section 2-3(1)(b) of the Juvenile Court

Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(b) (West 2018)) because their environment

was injurious to their welfare. The petition included allegations of an incident on November 2,

2018, where the minors were left home alone and scared. The petition also included allegations of

drug use by Mother and Father. Mother was convicted of possession of methamphetamine and was

on 24 months' probation. Father was on probation for a methamphetamine-involved conviction

and frequently was under the influence of alcohol and marijuana. Mother told A.B. that he could

not talk about drugs. Both Mother and Father refused a drug test. The petition for adjudication of

wardship also alleged abuse pursuant to section 3(2)(i) of the Juvenile Court Act (705 ILCS 405/2-

3(2)(i) (West 2018)) because of excessive corporal punishment by Father. The allegations included

that Father had put Mother in a "choke hold." Father had also, allegedly, spanked A.B. with his

pants down using a paddle, hand, shoe or belt on A.B.'s buttocks and legs. The spanking left welts.

---

[1]Hollis B. was referenced as T.B.'s father throughout the proceeding, but had married Mother after T.B.'s birth. The State provided notice to any and all unknown fathers by publication and no unknown father appeared during the proceeding.

Mother would yell for Father to stop, to no avail. Father had also threatened to hit the next-door neighbor that the children referred to as "Nana."

¶ 6    A shelter care hearing was held on November 6, 2018. During the hearing, Mother and Father stipulated to the petition. The trial court found probable cause to believe T.B. and A.B were neglected and abused, as defined by the Juvenile Court Act. Temporary custody was given to the Guardianship Administrator of DCFS who was authorized to place the minors with a temporary custodian. DCFS was ordered to provide needed services for substance abuse, parenting, and domestic violence.

¶ 7    On September 12, 2019, the case was set for an adjudicatory hearing. Prior to the hearing, Mother and Father stipulated to the two paragraphs of the petition regarding their criminal history involving methamphetamines. The parties agreed to an order of continuance under supervision for 12 months for the completion of the service plans developed by DCFS. The minors remained in custody and in the guardianship of DCFS. The parents were awarded supervised visitation of the minors at the discretion of DCFS or their contracting agency, Caritas Family Solutions of Illinois (Caritas). A status conference was set on December 19, 2019, with the anticipation of the completion of the service plans and to return the minor children home before Christmas.

¶ 8    On December 19, 2019, the State filed a petition to terminate the order of continuance under supervision. The State alleged that both parents failed to cooperate with DCFS, failed to complete the services required to successfully return the minors home, and failed to correct the conditions which brought the minors into care. Attached to the petition to terminate the order of continuance under supervision was a status report completed by DCFS.

¶ 9    The DCFS report dated December 3, 2019, included that Mother was required to complete a substance abuse assessment, mental health assessment, psychiatric evaluation, parenting courses,

3

domestic violence counseling, and obtain stable employment and housing. Mother had self-reported that she completed an assessment through Centerstone, but DCFS had not received a mental health or substance abuse assessment at that time of the report. Mother had not started parenting classes or domestic violence counseling. Mother's caseworker reported that McDonald's had employed Mother on November 25, 2019. The caseworker had spoken to her employer and discovered that Mother had missed five shifts soon after she became employed. The caseworker also had scheduled five drug tests for Mother. On October 25, 2019, Mother had tested positive for methamphetamines. Mother failed to appear for the other four scheduled drug tests. Mother and Father had supervised visitation with the children on Tuesdays at a McDonald's in Mt. Vernon, Illinois. Mother attended 8 of the 11 scheduled visitations with T.B. and A.B. The visits typically went well, and the children were excited to see their parents.

¶ 10    On February 11, 2020, the court held a hearing on the motion to terminate the order of continuance under supervision. Mother appeared and stipulated to the termination of the order of continuance under supervision and again admitted to allegations contained in the petition for adjudication of wardship. The trial court set the matter for a dispositional hearing on March 17, 2020.

¶ 11    On March 3, 2020, Emily Weigand, a foster care case manager, filed a dispositional hearing report, updated service plan, integrated assessment, and visitation plan. The report indicated that after DCFS investigated the allegations, Mother was indicated for having abused T.B. and A.B. According to the updated service plan, Mother completed assessments on January 8, 2020, and then failed to attend her first appointments for mental health and substance abuse counseling. Mother additionally failed to appear for eight random drug tests from October 2019 through March 2020 that were scheduled by her caseworker. Mother tested positive on February 11, 2020, for

4

methamphetamines and THC during a drug test scheduled by her probation officer. Mother had not yet enrolled in domestic violence counseling. Mother self-reported that she had completed parenting classes although she never attended a class. She had not been able to retain employment. Mother's caseworker contacted her landlord and was informed that Mother had broken the lease by allowing Father and a dog to reside with her. Mother had attended approximately 75% of the scheduled visitations with T.B. and A.B.

¶ 12    The dispositional hearing was continued from March 17, 2020. On April 23, 2020, the clerk of the circuit court mailed a notice to all parties, including Mother and her attorney, that the disposition hearing was scheduled for June 16, 2020. On April 30, 2020, Mother's notice was returned to the courthouse. An additional notice was mailed on June 2, 2020. The record did not indicate that the second notice to Mother was returned as undelivered.

¶ 13    On June 9, 2020, Weigand filed an amendment to the March 3, 2020, report. Mother had not made any progress on services. On May 29, 2020, Mother again tested positive for amphetamines, methamphetamines, and THC. Four additional drug tests were scheduled during March 2020 through May 2020, and Mother did not participate.

¶ 14    On June 16, 2020, the trial court held the dispositional hearing via video conference. Mother did not attend the hearing. Mother's counsel objected to the entry of the disposition order proposed by the State. The trial court found that Mother had been given adequate notice of the hearing date. A disposition order was entered that date. Mother was found unfit to care for, protect, train, educate, supervise, or discipline T.B. and A.B. Custody and guardianship of the minors were placed with DCFS. Visitation remained supervised. The order stated that appeal rights were given. Mother did not file a notice of appeal after the June 16, 2020, disposition order was entered.

5

¶ 15    On July 14, 2020, the court held a permanency hearing. The trial court found that Mother was not making reasonable efforts and substantial progress towards the minors returning home. The trial court found that the appropriate permanency goal was for the minor children to return home within 12 months. Mother was ordered to cooperate with DCFS, comply with the terms of the service plan, and correct the conditions which required the minors to be in care.

¶ 16    On December 11, 2020, DCFS filed a permanency hearing report. The report provided information regarding Mother's progress on her service plan. Mother self-reported that she had been attending psychiatric counseling, mental health counseling, and parenting classes. Mother's counselor reported that Mother had not attended a substance abuse counseling appointment since the beginning of 2020. Mother had not been appearing for scheduled drug tests and had not started domestic violence counseling. Mother was evicted from the transitional living center because she was selling drugs out of her room. Employment remained an issue. Mother also had issues with confirming visitation 24 hours in advance. A permanency hearing was held on December 22, 2020, and the trial court found that Mother had not made reasonable efforts and substantial progress toward returning the minors home.

¶ 17    On May 25, 2021, DCFS again filed a permanency hearing report. The report included Mother's progress on correcting the conditions that required the children to remain in care. Mother had attended 48 out of 54 scheduled behavioral health appointments from July 2020 to May 2021. Mother was participating in individual mental health counseling, early intervention substance abuse counseling, and Mother had completed a parenting education program. Mother had not completed the recommended psychiatric evaluation and had not initiated domestic violence classes. Mother continued to avoid drug tests. Since November 8, 2020, Mother had been living with a relative in Anna, Illinois. She was previously homeless. She was working as a direct support

6

professional in Missouri. Mother had been consistent with confirming weekly visitations since January 2021.

¶ 18　On June 7, 2021, the State filed a motion for termination of parental rights and for appointment of a guardian with power to consent to adoption. The State asserted in its motion that Mother was unfit for one or more of the reasons outlined in the Illinois Adoption Act (750 ILCS 50/1(D) (West 2020)). The State alleged that Mother had failed to maintain a reasonable degree of interest, concern, or responsibility as to the child's welfare (750 ILCS 50/1(D)(b) (West 2020)); Mother failed to protect the child from conditions within her environment injurious to T.B. and A.B.'s welfare (750 ILCS 50/1(D)(g) (West 2020)); Mother failed to make reasonable efforts to correct the conditions that were the basis for the removal of the children during any nine-month period following adjudication (750 ILCS 50/1(D)(m)(i) (West 2020)); and Mother failed to make reasonable progress towards the return of the child to her during any nine-month period following adjudication (750 ILCS 50/1(D)(m)(ii) (West 2020)). The nine-month period relied on by the State was from June 16, 2020, to March 16, 2021.

¶ 19　On June 8, 2021, a permanency order was entered. The trial court found that the appropriate permanency goal was substitute care pending determination of termination of parental rights because the parents had failed to complete the services recommended in the service plan. Mother had not made reasonable efforts or substantial progress towards the goal of the minors returning home.

¶ 20　On August 27, 2021, the trial court began the hearing on the termination of parental rights. Dylan Winters, a foster care case manager, testified that he worked at Caritas from September 2018 through September 2019. Winters testified that he had assisted with completing the integrated assessment and initial service plan for Mother dated May 7, 2019. Both documents were admitted

into evidence. Through the integrated assessment process, Winters identified that Mother would benefit from mental health counseling, parenting classes, substance abuse counseling, domestic violence classes, employment, and housing.

¶ 21    Emily Weigand testified via Zoom on August 27, 2021, during the termination hearing. Weigand had worked for Caritas from September 2019 until August 2020 and was assigned to T.B. and A.B.'s cases. Weigand had created a service plan in March 2020, and the service plan was admitted into evidence. Weigand testified that in March of 2020, Mother had completed a mental health assessment, but had not followed through with service recommendations. Mother had reported that she started parenting classes. However, when Weigand followed up with the service provider, Mother had not started taking the classes as she reported. Mother "very infrequently" appeared for drug tests according to Weigand. While Weigand was the caseworker, bus passes were provided for Mother to travel to Carbondale for drug tests. Mother was living in a homeless shelter when Weigand was her caseworker. Weigand testified that she was informed that drugs were being sold out of Mother's room at the shelter and Mother violated the rules by allowing Father onto the property. Mother had visitation with the children for one hour a week. During the time frame of March 2020 until August 2020, Mother had missed five visits with the children and was unemployed.

¶ 22    Luke Thompson testified that he worked at Caritas from July 2020 until January 2021. Thompson created a service plan dated November 9, 2020, and the service plan was admitted into evidence. While Thompson was Mother's caseworker, he arranged for three drug tests and Mother failed to appear for all three tests. Mother initially enrolled in mental health counseling in July of 2020, but did not attend counseling sessions until December 2020. Thompson had no record of Mother attending substance abuse counseling or domestic violence counseling while he was the

8

caseworker. Mother had not completed the parenting class requirement in her service plan. Mother had informed Thompson that she had moved into a house on November 8, 2020. According to Thompson, however, Mother had not obtained stable housing because she was required to maintain her housing for six months and had not done so while he was the caseworker. Mother had quit her job at McDonald's and continued to report that she was still employed. In regard to visitation, Mother had missed some sessions although Thompson testified that "visits with the children always went well." Visitation took place an hour and a half away from Mother. Caritas provided gas cards to Mother when she had access to a vehicle. Mother was also provided bus passes to reach the services she was required to complete.

¶ 23   On September 24, 2021, the trial court resumed the hearing on the State's motion for termination of parental rights. Kelsie Simpson testified that she was the caseworker for T.B. and A.B. from January 8, 2021, until July 12, 2021. Simpson testified to a service plan that she created on May 17, 2021, and the service plan was admitted into evidence. Mother had completed her parenting classes. Mother was employed while Simpson was the caseworker. Mother continued to avoid drug tests between January 2021 and March 2021. Between July of 2020 and March of 2021, Mother had a 50% attendance rate for substance abuse counseling, mental health, and psychological counseling. The caseworker explained that substantial compliance with the service plan required a 90% attendance rate. Mother also had not completed domestic violence classes. Simpson testified that not having transportation to the drug testing facility was a challenge for Mother. The closest location was about 30 minutes away from Mother's home and an hour away from her employment. Simpson testified that if Mother would have informed Simpson that Mother was working on the day of a drug test, the test would have been rescheduled. Caritas stopped providing a gas card after April 2021, when two receipts had been lost. Bus passes were suspended

after they were used for reasons other than attending services or visitation. Simpson testified that she supervised virtual visitation on March 9, 2021. During that visitation, in front of the children, the caseworker believed that Mother had stated, "if you ever put your hands on me like that again," and, "you're ruining your marriage." Simpson ended the visit because she felt that it was not a safe environment for the children to watch Mother and Father argue.

¶ 24   Mother testified at the termination hearing on September 24, 2021. She testified that the godfather of the children had spanked A.B. and left a mark on his hip. The school had reported the injury to DCFS. Mother stated that after T.B. and A.B. were removed from her home, she participated in the integrated assessment to receive services. She had signed consent forms for her caseworkers to access information from service providers that were related to her service plan. Mother completed a mental health assessment. She attended counseling sessions for mental health, and she was prescribed a mood stabilizer. She stated that she completed her substance abuse counseling in March 2020. Mother had been receiving mental health services since 2015 and continued to engage in mental health services for the entire nine-month period alleged in the termination proceeding.

¶ 25   Mother testified to her struggles with attending the various services required. Mother had a difficult time scheduling mental health appointments because of turnover with her counselors. She started services with Centerstone in January 2019 but had trouble attending in 2020 after services were disrupted by Covid-19. Mother also had a difficult time completing service plan hours while maintaining employment, which was necessary in order to maintain housing. Mother testified that if she was going to have to miss an appointment because of work, she would call ahead of time to reschedule. Mother testified that she struggled to arrange transportation if she did

not receive advance notice of a drug test because only a few shuttles were available to take her to Carbondale during the day, where the testing facility was located

¶ 26   Mother testified that it would take her 2½ hours to travel by bus from Cape Girardeau, Missouri, where she worked, to Carbondale, Illinois. The bus ride from Anna, where she lived, to Carbondale was 20 to 30 minutes. Mother testified to a time where she was "stuck" in Carbondale after taking a drug test because she did not have enough time to catch the bus home. Mother was working part-time in Cape Girardeau from February 22, 2021, until June 15, 2021, as an assistant home healthcare worker. She would work at most 64 hours a month. Mother testified that she had only submitted to two drug tests and had tested positive for methamphetamines.

¶ 27   Mother also testified that she was homeless from January 2021 until two weeks prior to the September 2021 hearing date. Mother testified that she had not completed domestic violence counseling. Mother believed she started the domestic violence course in February or April of 2021. The domestic violence counseling sessions were over the phone.

¶ 28   Mother additionally testified that she would have in-person visitation one hour a week and a 30-minute video chat on Sundays. Mother testified to the visitation session described by Simpson. Mother believed that the incident occurred in early 2020, and she stated that she was not arguing with Father. Mother explained that her roommates were fighting and she "started to get loud with them because of being upset."

¶ 29   Father then testified to the progress he had made on his service plan. After Father's testimony, the trial court found that the State met its burden of proving Mother and Father to be unfit by clear and convincing evidence. The trial court found that the parents failed to maintain a reasonable degree of interest, concern, and responsibility as to the children's welfare; failed to protect the children from conditions within their environment injurious to their welfare; failed to

11

make reasonable efforts to correct conditions that were the basis for the removal of the children during any nine-month period following adjudication; and failed to make reasonable progress towards the return of the children during a nine-month period following adjudication. The trial court stated that it "specifically considered the nine-month period that was specified by the State in this matter for the allegations for which it was pertinent, and that designation was needed." The trial court also stated that it considered "anything prior to or between the time period of the adjudication and the date of filing of the motion for termination for other allegations that do not relate specifically to that nine-month time period."

¶ 30    The trial court found that neither parent had completed all of the services they were required to complete as set forth in their service plans. The trial court indicated that it understood that Covid-19 added difficulty and challenges, but the impact of Covid-19 only impacted a few months within the nine-month time period. The trial court understood that Mother and Father loved their children and wanted them back into their care but found that they had not made reasonable efforts or substantial progress during the nine-month time period specified by the State. The trial court also indicated that the parents had only recently begun involvement in some services that could have been addressed much earlier.

¶ 31    The trial court found that both Mother and Father continued to have issues with stable employment and housing. The trial court was concerned by the failure of the parents to undergo the drug testing that was scheduled for them. The only drug tests completed by Mother indicated positive results. The trial court understood that it was difficult for Mother to travel to Carbondale for the drug test. However, the trial court was apprehensive about returning children to the care of a parent with a substance abuse issue where substance abuse treatment had not been completed. The trial court further noted that the initial petition alleged domestic violence and physical abuse.

12

In the three years since the inception of this case, neither Mother nor Father had completed domestic violence services. The trial court found both parents to be unfit.

¶ 32    Immediately following the fitness hearing, the trial court held the best interest hearing. Erica Berner, a foster care case manager with Caritas, testified that she had been assigned to T.B. and A.B.'s case two weeks prior to the hearing. Berner had met with the children and the foster parent, Jeremy Price. Berner believed that the children had formed an attachment to Price. He had been caring for T.B. and A.B for about a year and a half after the children were removed from an abusive foster placement. T.B. and A.B. were receiving counseling on a weekly basis. Price's home was clean and both children had their own bedrooms. Price's parents live two houses away from him and they provide assistance with the children. Berner testified that both children were comfortable with Price and in their spaces at his house. They would talk, laugh, and smile together, and call Price "Dad." Price wished to adopt both T.B. and A.B. Berner had not spoken to the children about their parents.

¶ 33    Jeremy Price testified that he has known T.B. and A.B. for three years. He lives in a three-bedroom home with a fenced-in yard. A.B. was on a flag football team and T.B. played soccer. Price takes the children to doctor and counseling appointments. A.B. had emotional issues and had been diagnosed with oppositional defiant disorder and attention deficit hyperactivity disorder (ADHD). T.B. also has defiance issues, according to Price, and attends counseling sessions, but has not received a diagnosis. Both T.B. and A.B. are in third grade. T.B. is a straight-A student. A.B. is improving while they are working on medication for his ADHD. Price's parents help with the children. The children have a good relationship with Price's parents and call them "Dodo" and "Pop." Price was questioned about raising biracial children. T.B. and A.B. are biracial and Price is not. Price testified that he has friends and coworkers with a mixed-race background who have

13

provided information on raising children under these circumstances. Price testified that he would like to adopt both T.B. and A.B.

¶ 34    Mother testified that she loves her children and wants her children to be returned to her. Mother claimed that T.B. and A.B. were taken because A.B.'s godfather had hurt him, and the school found a bruise on A.B.'s hip. Mother testified that her mental health counseling has helped her with control. At the time of the best interest hearing, Mother was employed and lived in an apartment complex in Carbondale, Illinois. Mother testified that she had completed all of her services with the exception of completing the domestic violence course. Mother had four to six weeks of domestic violence classes remaining. Mother testified that she has not used drugs for over a year and intends to remain clean of drugs. She stated that she had not tried using drugs until after her children were removed "because it numbs you." She claimed that she would attempt to contact Price daily to speak to the children.

¶ 35    At the conclusion of the hearing, the trial court found that T.B. and A.B. had been in foster care for over three years and had bonded with Price. The trial court acknowledged that Mother had made an attempt to complete services after the State filed a motion for termination. The trial court did not believe that Mother had shown stability to be able to support the children and herself. The trial court was concerned with Mother stating that she was not going to use drugs, but she had not complied with numerous drug tests. Mother also had not completed domestic violence counseling even though domestic violence was a major reason for the children having been taken into custody. The trial court found that it was in the best interest of the minors for the petition for termination to be granted. The case goal was changed to adoption. The trial court informed the parents that they had 30 days to file an appeal regarding the decision. This appeal followed.

¶ 36                                    II. ANALYSIS

¶ 37    On appeal, Mother claims that the trial court erred in entering its dispositional order and erred in terminating Mother's parental rights. The State argues that this court lacks jurisdiction to address Mother's claim regarding the dispositional order because Mother did not appeal that order in a timely manner.

¶ 38    Time requirements for filing a notice of appeal under the Juvenile Court Act (705 ILCS 405/1-1 *et seq.* (West 2020)) are governed by the rules applicable to civil cases. *In re C.J.*, 325 Ill. App. 3d 502 (2001). Illinois Supreme Court Rule 303(a)(1) provides that a notice of appeal from a final judgment must be filed within 30 days after entry of the judgment. Ill. S. Ct. R. 303(a)(1) (eff. July 1, 2017). A dispositional order is a final appealable order. *In re J.J.*, 316 Ill. App. 3d 817, 826 (2000). The dispositional order was entered on June 16, 2020, and Mother filed a notice of appeal over a year later, on October 20, 2021. We therefore lack appellate jurisdiction over Mother's appeal of the trial court's June 16, 2020, order and dismiss that portion of the appeal.

¶ 39    The authority to involuntarily terminate parental rights is found in the Juvenile Court Act (705 ILCS 405/1-1 *et seq.* (West 2020)) and the Adoption Act (750 ILCS 50/0.01 *et seq.* (West 2020)). *In re J.L.*, 236 Ill. 2d 329, 337 (2010). Section 2-29 of the Juvenile Court Act provides a two-step process for the involuntary termination of parental rights. 705 ILCS 405/2-29(2) (West 2020). The trial court first must find that the parent is unfit as defined in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2020)) based on clear and convincing evidence. *In re J.L.*, 236 Ill. 2d at 337. Then, the trial court determines whether the State has proven that it is in the child's best interest to terminate parental rights by a preponderance of the evidence. *In re J.H.*, 2020 IL App (4th) 200150, ¶ 67.

¶ 40    A determination of unfitness involves factual findings and credibility assessments which are accorded great deference by a reviewing court, and the trial court's factual findings will not be reversed unless they are against the manifest weight of the evidence. *In re M.J.*, 314 Ill. App. 3d 649, 655 (2000). A determination is against the manifest weight of the evidence only if the opposite conclusion is clearly evident. *In re Gwynne P.*, 215 Ill. 2d 340, 354 (2005). The State has the burden of proving by clear and convincing evidence that a parent is unfit. *In re Gwynne P.*, 215 Ill. 2d at 354.

¶ 41    In this case, the trial court concluded that the State had proven one or more grounds of unfitness against Mother. Mother had failed to make reasonable efforts to correct the conditions that led to the removal of both T.B. and A.B. during the nine-month period after the adjudication of neglect (750 ILCS 50/1(D)(m)(i) (West 2020)), and she failed to make reasonable progress toward the child's return home during the nine-month period after the adjudication of neglect (750 ILCS 50/1(D)(m)(ii) (West 2020)). The trial court additionally considered that Mother had failed to maintain a reasonable degree of interest, concern, or responsibility as to the child's welfare (750 ILCS 50/1(D)(b) (West 2020)), and Mother failed to protect the child from conditions within her environment injurious to the welfare of T.B. and A.B. (750 ILCS 50/1(D)(g) (West 2020)).

¶ 42    "Reasonable efforts" relate to the goal of correcting the conditions that led to the removal of the children from the parent. *In re R.L.*, 352 Ill. App. 3d 985, 998 (2004). Reasonable efforts are judged by a subjective standard and focus on the amount of effort that is reasonable for the specific parent involved. *In re R.L.*, 352 Ill. App. 3d at 998. The court must determine whether the parent has made earnest and conscientious strides toward correcting the conditions that led to the removal of the minor from the home. *In re L.J.S.*, 2018 IL App (3d) 180218, ¶ 24.

16

¶ 43    In contrast, "reasonable progress" is an objective standard that focuses on the amount of progress made toward the goal of returning the child to the parent. *In re C.M.*, 305 Ill. App. 3d 154, 164 (1999). Reasonable progress requires, at a minimum, measurable or demonstrable movement toward the goal of reunification. *In re Jacorey S.*, 2012 IL App (1st) 113427, ¶ 21. If a service plan has been established to correct the conditions that were the basis for the removal of the child from the parent, a "failure to make reasonable progress" includes a parent's failure to substantially fulfill his obligations under the service plan. 750 ILCS 50/1(D)(m)(ii) (West 2020).

¶ 44    Mother argues that the trial court erred when it considered matters outside of the statutory nine-month period to prove unfitness. A court is not permitted to consider any evidence outside the nine-month period as mandated in section 1(D)(m) of the Adoption Act. *In re A.S.*, 2014 IL App (3d) 140060, ¶ 35. The trial court stated that it had "specifically considered the nine-month period that was specified by the State in this matter for the allegations for which it was pertinent, and that designation was needed." Those allegations specified by the State were that Mother had not made reasonable efforts and reasonable progress under section 1(D)(m) during the specific nine-month period from June 16, 2020, to March 16, 2021. The Adoption Act, however, provides several grounds to determine unfitness where evidence is not limited to a specific a nine-month period. The State had additionally alleged that Mother was unfit pursuant to section 1(D)(b) for her "failure to maintain a reasonable degree of interest, concern or responsibility as to the child[ren]'s welfare." 750 ILCS 50/1(D)(b) (West 2020). The State also had alleged that Mother was unfit pursuant to section 1(D)(g) for her "failure to protect the child[ren] from conditions within [her] environment injurious to the child[ren]'s welfare" (750 ILCS 50/1(D)(g) (West 2020)). The nine-month period does not apply to sections 1(D)(b) and 1(D)(g) of the Adoption

Act. 750 ILCS 50/1(D)(b), (g) (West 2020). The trial court was not limited to the nine-month period when considering the evidence offered pursuant to those provisions.

¶ 45     The children were first brought into care due to allegations that their environment was injurious to their welfare and that their parents inflicted or allowed abuse to be inflicted through excessive corporal punishment. It was alleged that Mother had a criminal history and was convicted for possession of methamphetamine; the children were left home alone and were too young to be left alone; T.B. disclosed that Father had choked Mother in front of the children; A.B. disclosed that Father had hit him with a paddle, hand, shoe, or belt, leaving marks described as welts; Mother was unable to stop Father from hitting A.B.; A.B. reported that Mother did not allow him to talk about drugs; and Mother refused to submit to drug testing.

¶ 46     Based on the allegations, a service plan was created. The service plan established action steps and services that Mother needed to complete to correct the conditions that led to the removal of the children and to work toward the goal of having the children return home. Mother's plan required her to complete services based on a substance abuse assessment, mental health assessment, and psychiatric evaluation. She also was required to complete a parenting course, complete domestic violence counseling, and obtain stable employment and housing.

¶ 47     Mother claims that she made a reasonable effort to correct the conditions that led to the removal of the children and argues that her failure to attend drug screenings should not terminate her parental rights. Mother argues that the service plan was onerous and created an unreasonable hardship based on her lack of transportation. The bus schedule limited her ability to travel from her job in Cape Girardeau, Missouri, to the drug testing facility in Carbondale, Illinois. However, Mother testified that she began working in Cape Girardeau, in February 2021, which was toward the end of the specified nine-month period. Mother did not account for missing over 20 scheduled

18

drug tests during the relevant period following the adjudication of neglect, prior to her employment in Missouri. Mother never produced a drug test with negative results. Additionally, multiple case workers testified that Mother was offered and provided with gas cards and bus passes to complete her services. When the children were initially brought into care, Mother refused to submit to a drug test. Mother's continued refusal to submit to drug tests demonstrates that she has not made a reasonable effort to comply with the substance abuse portion of her service plan.

¶ 48 Mother's argument also fails to address additional concerns that caused the children to be removed from her care. Allegations of domestic violence and abuse were raised in the initial petition. Mother did not enroll in domestic violence counseling until the end of the relevant nine-month period and she did not complete domestic violence counseling services. Transportation was not an issue for Mother to complete domestic violence counseling because the sessions were conducted over the phone. Mother had also missed half of her mental health, psychological counseling, and substance abuse counseling between July of 2020 and March of 2021. During the nine-month time period, Mother was provided with bus passes and gas cards to attend these services. Reasonable efforts were not made by Mother to complete all of the recommended services in her service plan during the relevant period after adjudication. The trial court's determination that Mother had not made reasonable efforts was not against the manifest weight of the evidence.

¶ 49 The trial court additionally found that Mother had not made reasonable progress toward the return of the children within the nine-month time frame. As previously discussed, Mother had not completed all of the services set forth in her service plan. Mother had attended half of her counseling sessions and substantial compliance required 90% attendance. Mother continued to struggle with stable housing and employment. At the end of the nine-month period, Mother was

homeless. The only drug tests submitted to the trial court showed that Mother continued to use methamphetamines. Mother continued to have issues with domestic violence. On March 9, 2021, an online visitation session was terminated early by the caseworker after Mother made comments indicative of domestic violence remaining in the household. The evidence presented clearly demonstrated that Mother failed to make a measurable movement toward the return of the children within the relevant time period. The trial court's determination that Mother failed to make reasonable progress was not against the manifest weight of the evidence.

¶ 50    Mother failed to make any arguments addressing the additional grounds of unfitness under the Adoption Act raised by the State and considered by the trial court. Only one ground of unfitness needs to be proven in order to find a parent unfit. *In re R.L.*, 352 Ill. App. 3d at 998. Because the trial court's determination of unfitness based on reasonable efforts and reasonable progress was not against the manifest weight of the evidence, there is no need to address the two additional grounds for unfitness raised by the State.

¶ 51    Mother also did not address the best interest determination. Based on the evidence presented, we find that the trial court's determination that the termination was in the best interests of T.B. and A.B. was not against the manifest weight of the evidence.

¶ 52                                III. CONCLUSION

¶ 53    The trial court's unfitness finding was not against the manifest weight of the evidence and the trial court committed no error in terminating Mother's parental rights.

¶ 54    Affirmed in part and dismissed in part.