NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2023 IL App (4th) 230353-U

NO. 4-23-0353

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
August 14, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* J.M., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Tazewell County |
| Petitioner-Appellee, | ) | No. 21JA19 |
| v. | ) | |
| | ) | Honorable |
| Dani H., | ) | David A. Brown, |
| Respondent-Appellant). | ) | Judge Presiding. |

JUSTICE DOHERTY delivered the judgment of the court.
Justices Turner and Steigmann concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The trial court's best interest determination was not against the manifest weight of
the evidence, so its judgment terminating respondent's parental rights is affirmed.

¶ 2    In September 2022, the State filed a petition to terminate the parental rights of

respondent Dani H. as to her minor child, J.M. (born in 2021). In March 2023, the trial court

found termination of respondent's parental rights would be in J.M.'s best interest. We note

J.M.'s father, Dalton M., is not a party to this appeal.

¶ 3    Respondent appeals, arguing the trial court's best interest determination was

against the manifest weight of the evidence. We affirm.

¶ 4                                    I. BACKGROUND

¶ 5                              A. Adjudication of Wardship

¶ 6        On January 25, 2021, the State filed a petition for adjudication of wardship alleging J.M. was neglected pursuant to section 2-3(1)(b) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(b) (West 2020)) due to being in an environment injurious to his welfare. Specifically, the State alleged that: (1) respondent was found unfit in a prior case and had not completed services to restore her to fitness; (2) respondent tested positive for opiates upon giving birth to J.M.; and (3) J.M. tested positive at birth for cocaine, opiates, and marijuana. The trial court found there was probable cause to believe J.M. had been neglected and placed him in the temporary custody of the Illinois Department of Children and Family Services (DCFS).

¶ 7        The trial court held an adjudicatory hearing on September 24, 2021. The court found J.M. neglected pursuant to the factual basis set forth in the State's petition for adjudication of wardship. At the dispositional hearing held the same day, the court found respondent unfit for these same reasons, as well as due to her continued drug use. The court found it in J.M.'s best interest to be made a ward of the court. The court ordered that custody and guardianship of J.M. would remain with DCFS.

¶ 8                    B. Termination of Parental Rights

¶ 9        In September 2022, the State filed a petition to terminate parental rights alleging respondent was unfit for failing to make reasonable progress toward the return of J.M. during the nine-month period following his adjudication of neglect, namely, September 24, 2021, to June 24, 2022 (750 ILCS 50/1(D)(m)(ii) (West 2022)).

¶ 10                    1. *Unfitness*

¶ 11	On February 9, 2023, respondent filed an amended answer stipulating the State could prove the failure to make reasonable progress allegation in the termination petition by clear and convincing evidence.

¶ 12	At a March 2023 hearing, the trial court accepted the stipulation and found respondent unfit.

¶ 13	2. *The Best Interest Hearing*

¶ 14	The trial court held the best interest hearing on March 23, 2023. The court accepted the March 7, 2023, best interest report prepared by Lutheran Social Services of Illinois (LSSI). The report indicated that J.M. was living with his aunt, Courtney M., who was providing J.M. a safe and stable home that met his needs. Cheyenne Denoyer, the child welfare specialist who wrote the report, observed a "remarkable bond" between J.M. and Courtney. Courtney, who expressed her desire to adopt J.M., provided him with adequate food and clothing and was able to meet his significant medical needs. While respondent had a "good relationship" with J.M. and consistently attended visits, she "failed to maintain a substance free lifestyle." Respondent gave birth to another child in June 2022, who tested positive for various substances. Respondent attended her drug drops inconsistently, completing only 61% of them. She tested positive for various substances throughout and missed child and family team meetings scheduled to discuss her ongoing substance abuse issues.

¶ 15	Denoyer testified she had been the caseworker for this matter since November 2022. Denoyer provided an update to the best interest report, testifying respondent tested positive for morphine on February 23, 2023, and missed her drug drop on March 7, 2023, reportedly due to a work conflict. Denoyer testified that she visits J.M.'s foster home twice a month and has found it clean and appropriate, with no safety concerns. Denoyer reported there was "absolutely"

a good relationship between J.M. and his foster parents. Denoyer has observed love and affection between J.M. and his foster parents and foster siblings. J.M.'s foster family treats him like a part of their family. J.M. has significant medical needs, including requiring occupational therapy for hypotonia, and Courtney was addressing them by bringing J.M. to his appointments and working with him at home. Courtney also provided food and clothing for J.M. She facilitated a relationship between J.M. and his paternal grandparents. Denoyer explained that J.M.'s foster parents have expressed their willingness to adopt him.

¶ 16    Ma'lachi Jimoh testified he was the LSSI caseworker for this case from April 2022 to November 2022. Jimoh visited the foster home and found it clean and appropriate, and he observed a "pretty loving" relationship between J.M. and his foster parents. During Jimoh's time handling this case, respondent and Dalton were "somewhat" inconsistent and sporadic with visitation. Jimoh had no concerns with J.M. being in the foster home and his foster parents wanted to adopt him. On cross-examination, Jimoh acknowledged respondent would "always bring toys and snacks" to visits. Jimoh also clarified that both respondent and Dalton would "interact" with J.M. in ways such as talking to him, playing games, and playing with toys with him.

¶ 17    Courtney testified she is J.M.'s paternal aunt and has been his foster mother since he was released from the hospital after being born. J.M. shows love and affection to her husband (J.M.'s foster father), gets along with their three children, and is well-integrated into the family. Courtney takes care of J.M.'s medical needs and provides food for him but acknowledged respondent provides "most" of his clothes. Courtney and her husband are willing to adopt J.M. if necessary and are able to provide him the necessary safety, security, love, and affection.

¶ 18        Respondent testified that she visited with J.M. once a month and their bond was like "any mother/son bond that doesn't exactly get to see each other that often." When J.M. saw respondent at visits, he gave her "big hugs" and said he loves her. Respondent was not currently attending J.M.'s medical appointments because Courtney asked her not to, but respondent "absolutely" wanted to attend them. Respondent was providing for J.M. as much as she could, for instance, through buying him clothes and Christmas gifts. Respondent was "a little bit" concerned over the prospect of J.M. being unable to have a relationship with his siblings if her rights were terminated. To respondent's knowledge, Courtney was not doing anything to facilitate a relationship between them. Respondent did not want her rights terminated and did not feel termination would be in J.M.'s best interest. On cross-examination, respondent acknowledged using drugs with Dalton in the past, but she asserted the last time they did so was before J.M. was born.

¶ 19        In closing arguments, the State argued that while respondent provided clothing for J.M., Courtney was better able to provide food, shelter, and care, particularly for his medical conditions. J.M. was loved by, and integrated with, his foster family. J.M. being with Courtney on a consistent basis allows the development of his identity. J.M.'s senses of love, attachment, and being valued weighed more in favor of Courtney, and his senses of security, familiarity, and continuity of affection "without a doubt" weighed more in favor of Courtney. While there was "no doubt that they both love [J.M.]," his parents were no closer to having him returned to them than when he was first taken into care.

¶ 20        Respondent's counsel noted that respondent loved J.M. and provided him gifts and most of his clothing. Counsel noted that respondent wanted to attend J.M.'s medical appointments but did not do so out of respect for Courtney's wishes. Counsel was concerned

about the possibility that J.M. would not have a relationship with his siblings if respondent's rights were terminated and asked the trial court to find it in J.M.'s best interest not to terminate his mother's rights.

¶ 21 Finally, the guardian *ad litem* (GAL) noted it was clear there was a bond between J.M. and his biological parents but stated J.M. "needs more than that" and "can't continue to wait." The GAL emphasized that J.M. is "just two years old, and he needs permanency. He deserves permanency. He deserves a safe, stable home with sober parents, and that's not these parents. That's the foster parents."

¶ 22 The trial court noted that J.M. and his parents have a "significant bond" and that "this is a closer case than many." However, the court also noted J.M. had been in care since he was 20 days old, and his parents were no closer to having him returned to them. According to the court, it needed to see "a long series of negative drops, and we just don't have that."

¶ 23 The trial court made the following findings:

"[A]s I go through the statutory factors, the child's identity is formed in substitute care.

His familial ties are—I think arguments have been well articulated today that familial ties may favor termination and may favor not terminating, and so that's kind of a toss-up under these circumstances.

The child's sense of attachments is with both parents, but also the foster parents, and also, it's kind of the—it weighs in both favor and against.

Certainly security and familiarity is with the present placements and foster care. Continuity of affection and least disruptive placement and the need for permanence weigh in favor of termination.

I think the risks of substitute care are minimized in this circumstance because of the family situation with the foster mom and the family.

And the—as I look at the need for stability and the continuity of relationships and permanency, [respondent] and [Dalton] just haven't been able to make any demonstration that they can provide that for [J.M.] going forward.

\* \* \*

And I'm not minimizing the challenges of addiction, but it just hasn't been overcome in [J.M.'s] short life, and to just wait and hope that it will be overcome I don't think is fair to [J.M.] so I do find that weighing all of the factors that it does weigh in favor of terminating the parental rights.

I find that the State has proven by a preponderance of the evidence that it is—that [J.M.'s] best interest will be served by a termination of the parental rights of [respondent] and Dalton M[.]"

¶ 24 The trial court retained wardship over J.M., named DCFS as his guardian with the right to consent to adoption, and changed the permanency goal to adoption.

¶ 25 This appeal followed.

¶ 26                           II. ANALYSIS

¶ 27 Because respondent stipulated to the allegation of unfitness in the State's termination petition, the only issue she raises on appeal in regard to termination of her parental rights is the trial court's finding that termination was in J.M.'s best interest, which she argues was against the manifest weight of the evidence.

¶ 28                    A. Termination of Parental Rights

¶ 29 Under section 2-29(2) of the Juvenile Court Act (705 ILCS 405/2-29(2) (West 2022)), the involuntary termination of parental rights involves a two-step process. First, the State must prove by clear and convincing evidence the parent is "unfit," as that term is defined in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2022)). *In re Donald A.G.*, 221 Ill. 2d 234, 244 (2006). If the court makes a finding of unfitness, then the State must prove by a preponderance of the evidence it is in the minor's best interest that parental rights be terminated. *In re D.T.*, 212 Ill. 2d 347, 366 (2004). In this appeal, we focus solely on the second step: the best interest determination.

¶ 30 In evaluating a child's best interest, the trial court must consider the following statutory factors:

"(1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's familial, cultural and religious background and ties; (4) the child's sense of attachments, including love, security, familiarity, continuity of affection, and the least disruptive placement alternative; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parent figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the person available to care for the child." *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1072 (2006); 705 ILCS 405/1-3(4.05) (West 2022).

¶ 31 Additionally, a trial court "may consider the nature and length of the child's relationship with his present caretaker and the effect that a change in placement would have upon

his emotional and psychological well-being." See *In re Jaron Z.*, 348 Ill. App. 3d 239, 262 (2004).

¶ 32    As is evident from the statutory language, the focus of the best interest analysis is not on the parent's desire or efforts to establish and maintain a parental relationship. Rather, it is on the child's best interest. "[T]he children's best interests trump even the parents' rights or interests in their children." *In re Custody of H.J.*, 2021 IL App (4th) 200401, ¶ 27. "A child's best interest is not part of an equation. It is not to be balanced against any other interest. In custody cases, a child's best interest is and must remain inviolate and impregnable from all other factors, including the interests of the biological parents." (Internal quotation marks omitted.) *Id.*

¶ 33                         B. Burden of Proof and Standard of Review

¶ 34    After a finding of unfitness, the focus shifts from the parent to the child. *D.T.*, 212 Ill. 2d at 364. The State must prove by a preponderance of the evidence that termination of parental rights is in the best interest of the minor. *Id.* at 366. Accordingly, "[a] trial court's finding that termination of parental rights is in a child's best interest will not be reversed on appeal unless it is against the manifest weight of the evidence." *In re Shru. R.*, 2014 IL App (4th) 140275, ¶ 24. "A finding is against the manifest weight of the evidence only if the evidence clearly calls for the opposite finding [citation], such that no reasonable person could arrive at the circuit court's finding on the basis of the evidence in the record." (Internal quotation marks omitted.) *In re J.H.*, 2020 IL App (4th) 200150, ¶ 68.

¶ 35                         C. Best Interest Determination

¶ 36    Here, the trial court's best interest determination was not against the manifest weight of the evidence. In addressing the statutory best interest factors, the court found that J.M.'s security and familiarity, the development of his identity, and continuity of affection would

be best served by staying in his present placement with Courtney and her husband. The court also found that the current foster home was the least disruptive placement for J.M. In making these findings, the court had before it the best interest report and testimony regarding J.M.'s medical conditions and needs and Courtney's ability to manage them appropriately. The court noted that returning J.M. home could not be seriously considered unless there was a "long series of negative drops," which the evidence simply did not show. After pointing out that J.M. had been in care since he was 20 days old, the court found that his need for permanency was best served by remaining in his current foster placement, as respondent had not sufficiently demonstrated her ability to provide for him going forward.

¶ 37        Respondent argues "the evidence is uncontroverted that [she] and J.M. shared a significant bond of love and attachment." Indeed, the trial court recognized this, referring to the "significant bond" J.M. shared with both respondent and Dalton. However, while a genuine bond of love and affection between J.M. and respondent may exist, "[f]ollowing a finding of unfitness *** the focus shifts to the child. The issue is no longer whether parental rights *can* be terminated; the issue is whether, in light of the child's needs, parental rights *should* be terminated." (Emphases in original.) *D.T.*, 212 Ill. 2d at 364. The law is clear that the existence of a parent-child bond "does not automatically insure that *** the child's best interests will be served by that parent." *In re J.B.*, 198 Ill. App. 3d 495, 499 (1990).

¶ 38        Respondent points out that the trial court described this matter as a close case and that the issue of J.M.'s familial ties was a "toss-up." However, the court's finding that termination was in J.M.'s best interest was well-supported by the record. As such, we cannot say that the evidentiary basis "clearly calls for the opposite finding" or is such that "no reasonable

person" could find as the court did here. (Internal quotation marks omitted.) *J.H.*, 2020 IL App (4th) 200150, ¶ 68.

¶ 39 In sum, considering all the evidence at the best interest hearing and the relevant statutory factors, we conclude that the trial court's finding that termination of respondent's parental rights was in J.M.'s best interest was not against the manifest weight of the evidence.

¶ 40 III. CONCLUSION

¶ 41 For the reasons stated, we affirm the trial court's judgment.

¶ 42 Affirmed.