NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2023 IL App (4th) 230527-U

NO. 4-23-0527

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
October 31, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* E.F., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Lee County |
| Petitioner-Appellee, | ) | No. 19JA1 |
| v. | ) | |
| | ) | Honorable |
| Russell F., | ) | Theresa M. Friel-Draper |
| Respondent-Appellant). | ) | Judge Presiding. |

JUSTICE KNECHT delivered the judgment of the court.
Justices Harris and Lannerd concurred in the judgment.

**ORDER**

¶ 1   *Held*: The appellate court affirmed the trial court's termination of respondent's parental rights, concluding its best interest determination was not against the manifest weight of the evidence.

¶ 2   In October 2022, the State filed a petition to terminate the parental rights of respondent, Russell F., as to his minor child, E.F. (born in January 2016). In April 2023, the trial court granted the State's petition and terminated respondent's parental rights. Respondent appeals, arguing the court erred in finding it in E.F.'s best interest to terminate his parental rights. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4   In January 2019, the State filed an amended petition seeking to adjudicate E.F. neglected and abused under the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/1-1 *et seq.* (West 2018)). The State alleged E.F. was neglected due to being in an

environment injurious to his welfare in that his mother called his grandmother saying she was "tired of living" and asked for E.F. to be picked up. The State alleged E.F. was abused in that his mother created a substantial risk of physical injury when she pushed and punched E.F.'s grandmother, who was holding E.F.'s brother, and pulled him from her arms. In August 2019, the trial court adjudicated E.F. neglected and abused pursuant to respondent's stipulation to both counts of the amended petition (705 ILCS 405/2-3(1)(b), (2)(ii) (West 2018)). (E.F.'s mother was deceased at this point.) In September 2019, in a separate dispositional order, the court found respondent unfit, unable, or unwilling to care for E.F. for reasons other than financial circumstances alone, made E.F. a ward of the court, and placed his custody and guardianship with the Illinois Department of Children and Family Services (DCFS).

¶ 5        In October 2022, the State filed a petition to terminate respondent's parental rights, alleging respondent was unfit because (1) he failed to maintain a reasonable degree of interest, concern, or responsibility for E.F.'s welfare (750 ILCS 50/1(D)(b) (West 2022)); (2) he failed to make reasonable efforts or reasonable progress in relation to E.F.'s return during the nine-month periods after the adjudication of neglect of June 11, 2021, through March 11, 2022, and January 1, 2022, through October 1, 2022 (750 ILCS 50/1(D)(m)(i), (ii) (West 2022)); (3) he was depraved due to at least three felony convictions (750 ILCS 50/1(D)(i) (West 2022)); and (4) he was repeatedly incarcerated, preventing him from discharging his parental responsibilities (750 ILCS 50/1(D)(s) (West 2022)). Following a January 23, 2023, hearing, the trial court found the State proved respondent was unfit by clear and convincing evidence as to all counts except the failure to maintain a reasonable degree of interest, concern, or responsibility for E.F.'s welfare.

¶ 6        On April 24, 2023, the trial court conducted a best interest hearing.

¶ 7          Lutheran Social Services of Illinois caseworker Felicia Carter testified E.F. had been placed with his foster family for three and a half years. There were three other children in the home. E.F. was observed to have a "normal" and "good" relationship with his foster parents and a "normal" and "very close" relationship with the other children. E.F. was attending counseling. The foster parents were able to provide for E.F.'s needs and their home was safe and appropriate. E.F. has two biological siblings. While he sees his biological brother, Carter did not know how often E.F. was seeing his grandfather or stepgrandmother. Respondent was bonded with E.F. and E.F. loved respondent. Respondent was visiting E.F. once a month. Respondent was safe and appropriate, and he demonstrated a "good" and "positive" father-son relationship, during those visits. However, respondent's visitation was disrupted by various periods of incarceration.

¶ 8          Matthew W., E.F.'s foster father, testified E.F. had a "true brother-sister relationship" with the other children in the home. Matthew did not think the other children in the home would see things any differently if E.F. was adopted. E.F. was involved in activities with his foster parents' extended families. E.F. saw his half-brother "usually maybe once a month" and his half-sister "every few months." (Matthew later stated E.F. had not seen his half-sister in "roughly" six months.) Matthew intended to continue fostering E.F.'s relationships with his siblings. Matthew, his wife, and Carter had been discussing increasing E.F.'s counseling services due in part to his behavior after visiting respondent. Matthew explained:

> "He becomes more defiant. He'll act up more, you know, getting into
> arguments or wanting to start fights with, you know, his brother or sisters
> in the house or not listening to my wife if she asked him something. He'll

start saying no a lot more and just refusing to do the things he's supposed

to be doing."

These behaviors would last for two to three days before they "balance[d] out."

¶ 9        Matthew and his wife arranged for E.F. to attend summer school and engage in tutoring over the summer for reading, writing, and math. Matthew and his wife were ready, willing, and able to adopt E.F. and provide for his needs.

¶ 10       Matthew had not taken steps for E.F. to be in contact with respondent's relatives because he was not given any instructions from DCFS to do so. While Matthew and his wife had no plans "either way" in this regard, they were not opposed to E.F. maintaining a relationship with respondent. Matthew wanted E.F. to see his half-sister more often, but "it all comes down to scheduling, unfortunately," with her father. Matthew was not doing anything to keep E.F. from seeing his siblings.

¶ 11       Respondent testified his visits with E.F. are "good" and they "have a good time." E.F. tells respondent he loves him, respondent loves and hugs E.F., and respondent does not want to be cut off from E.F. Respondent believed it would not be in E.F.'s best interest to be cut off from respondent's side of the family.

¶ 12       E.F.'s stepgrandmother testified she gets along "real well" with E.F. but was never given the opportunity to have him in her care. She only saw E.F. once since he was placed with his current foster family, and his foster parents had never reached out to her. E.F. has had no relationships with any of the children or grandchildren on her side of the family.

¶ 13       During closing arguments, the State emphasized respondent's repeated incarceration during this case. E.F. had been with his foster parents for half his life, and they have "been there for him day in, day out." The foster parents were ensuring E.F. had his

educational and therapeutic needs met, as well as his needs for food and shelter. The State argued respondent's parental rights should be terminated for E.F. to "be able to gain some sense of stability." Respondent's counsel argued there were "other options" besides termination available. Counsel noted termination of parental rights severs the father-son bond. Counsel argued it was in E.F.'s best interest "to pursue a different goal such as guardianship."

¶ 14　　　　The guardian *ad litem* (GAL) argued E.F.'s foster parents were providing the stability and consistency "that unfortunately [respondent] couldn't." According to the GAL, E.F.'s best interest would be served through permanency with his foster parents "so that he's not in the system and doesn't have the insecurity that can be created with a guardianship case."

¶ 15　　　　The trial court commended respondent for trying to remain part of E.F.'s life. The court noted, however, E.F. went into care at the age of three and respondent was incarcerated even before then. The court continued:

> "When I look at the best interest factors that the statute puts out for [E.F.], for over his lifetime he has had a stable and respectful relationship with the parents, has established bonds with siblings, the parents *** have a stable and loving home; the foster parents are providing and meeting the services that [E.F.] needs to thrive and be a happy child. He's attending school; he has safe and appropriate housing; he's been involved with the foster parents' extended families and the foster parents [are] attempting to foster the sibling relationship with [his half-brother], who is in another home; as well as [his half-sister], who is also in another home.
>
> One of the Court's considerations is also the effect that a change in placement would have on [E.F.'s] emotional and psychological wellbeing.

The foster parents have provided for this child, his stability and

loving relationship that every child deserves. ”

Based on that reasoning, the court found it was in E.F.'s best interest to terminate respondent's

parental rights.

¶ 16        This appeal followed.

¶ 17                    II. ANALYSIS

¶ 18        We note respondent does not challenge the trial court's unfitness findings on

appeal. Instead, respondent argues only the court's finding termination of his parental rights was

in E.F.'s best interest was against the manifest weight of the evidence. Accordingly, we confine

our analysis to that issue.

¶ 19        When a trial court finds a parent unfit, "the court then determines whether it is in

the best interests of the minor that parental rights be terminated." *In re D.T.*, 212 Ill. 2d 347, 352,

818 N.E.2d 1214, 1220 (2004). The State must prove by a preponderance of the evidence that

termination of parental rights is in the minor's best interest. *D.T.*, 212 Ill. 2d at 366. "Following a

finding of unfitness ***, the focus shifts to the child. The issue is no longer whether parental

rights *can* be terminated; the issue is whether, in light of the child's needs, parental rights *should*

be terminated." (Emphases in original.) *D.T.*, 212 Ill. 2d at 364. Thus, at the best interest stage of

termination proceedings, "the parent's interest in maintaining the parent-child relationship must

yield to the child's interest in a stable, loving home life." *D.T.*, 212 Ill. 2d at 364. In making the

best interest determination, the court must consider the factors set forth in section 1-3(4.05) of

the Juvenile Court Act (705 ILCS 405/1-3(4.05) (West 2022)). These factors include:

            "(1) the child's physical safety and welfare; (2) the development of the

            child's identity; (3) the child's background and ties, including familial,

- 6 -

cultural, and religious; (4) the child's sense of attachments, including love, security, familiarity, and continuity of affection, and the least-disruptive placement alternative; (5) the child's wishes; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parental figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the persons available to care for the child." *In re Jay. H.*, 395 Ill. App. 3d 1063, 1071, 918 N.E.2d 284, 291 (2009) (citing 705 ILCS 405/1-3(4.05) (West 2008)).

"A court may also consider the nature and length of the child's relationship with his present caretaker and the effect that a change in placement would have upon his emotional and psychological well-being." *In re Tiffany M.*, 353 Ill. App. 3d 883, 893, 819 N.E.2d 813, 822 (2004). "The court's best interest determination [need not] contain an explicit reference to each of these factors, and a reviewing court need not rely on any basis used by the trial court below in affirming its decision." *In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 19, 8 N.E.3d 1258. On review, "[w]e will not disturb a court's finding that termination is in the child[']s best interest unless it was against the manifest weight of the evidence." *In re T.A.*, 359 Ill. App. 3d 953, 961, 835 N.E.2d 908, 914 (2005). "A finding is against the manifest weight of the evidence only if the evidence clearly calls for the opposite finding [citation], such that no reasonable person could arrive at the circuit court's finding on the basis of the evidence in the record [citation]." (Internal quotation marks omitted.) *In re J.H.*, 2020 IL App (4th) 200150, ¶ 68, 162 N.E.3d 454.

¶ 20 The testimony established E.F. had been in his foster placement for three and a half years and developed close relationships both with foster parents and the other children in the

home. The foster parents had a safe and appropriate home for E.F. and provided for all his needs, including his educational and therapeutic needs. The foster parents also facilitated E.F.'s relationships with members of their extended families. The foster parents wanted E.F. to visit his half-sister more often, but this was complicated by scheduling difficulties with her father. While respondent and E.F. would interact positively during their visits, visitation was disrupted at times by respondent's repeated incarceration. Moreover, the testimony established how for up to three days after visits, E.F. would behave defiantly with his foster parents and argumentatively with the other children. The foster parents were ready, willing, and able to adopt E.F. and continue providing for his needs. We cannot say this evidence clearly demonstrates the trial court should have reached the opposite result in making its best interest determination.

¶ 21　　　　　Respondent emphasizes his and E.F.'s bond and love for each other in support of his argument the trial court erred. However, the existence of such a parent-child bond "does not automatically insure that the parent will be fit or that the child's best interests will be served by that parent." *In re J.B.*, 198 Ill. App. 3d 495, 499, 555 N.E.2d 1198, 1201 (1990). There are additional factors for the court to consider, such as "the child's need for permanence which includes the child's need for stability and continuity of relationships with parent figures." 705 ILCS 405/1-3(4.05)(g) (West 2022). "[A]t a best-interests hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *D.T.*, 212 Ill. 2d at 364. Here, the court determined, *inter alia*, "[t]he foster parents have provided for this child, his stability and loving relationship that every child deserves." Sufficient evidence was presented at the best interest hearing to support the court's determination.

¶ 22　　　　Respondent also argues termination of his parental rights puts E.F. at a substantial risk of psychological and emotional harm. However, the trial court stated it considered "the effect that a change in placement would have on [E.F.'s] emotional and psychological wellbeing." Respondent is essentially asking this court to reweigh the evidence and arrive at a different conclusion, which is something we cannot do. See *In re S.M.*, 314 Ill. App. 3d 682, 687, 732 N.E.2d 140, 144 (2000) ("The reviewing court does not reweigh the evidence or reassess the credibility of the witnesses."). Indeed, in cases involving minors, the trial court "receives broad discretion and great deference." *In re D.D.*, 2022 IL App (4th) 220257, ¶ 28, 215 N.E.3d 302. The evidence presented in this case demonstrates the court's best interest determination was not against the manifest weight of the evidence.

¶ 23　　　　　　　　　　　　　III. CONCLUSION

¶ 24　　　　For the reasons stated, we affirm the trial court's judgment.

¶ 25　　　　Affirmed.