NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2025 IL App (4th) 250376-U

NO. 4-25-0376

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
October 21, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* J.N., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Adams County |
|       Petitioner-Appellee, | ) | No. 21JA70 |
|       v. | ) | |
| Kreston N., | ) | Honorable |
|       Respondent-Appellant). | ) | John C. Wooleyhan, |
| | ) | Judge Presiding. |

JUSTICE ZENOFF delivered the judgment of the court.
Presiding Justice Harris and Justice Cavanagh concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The appellate court affirmed an order terminating respondent's parental rights to his son where the finding of unfitness was not against the manifest weight of the evidence.

¶ 2    Respondent, Kreston N., appeals an order terminating his parental rights to his son, J.N. Respondent challenges the sufficiency of the evidence supporting the trial court's finding of parental unfitness. We affirm.

¶ 3                       I. BACKGROUND

¶ 4    Respondent and Nicole C. are the parents of X.N. (born in September 2005), E.N. (born in May 2008), and G.N. (born in January 2011). Respondent and Antonia B. are the parents of J.N. (born in November 2015). All four minors came into care in 2021 and were subject to their own juvenile proceedings. Neither of the mothers ever involved themselves in those proceedings. Although the children's cases are interconnected, the present appeal concerns only respondent's

parental rights to J.N.

¶ 5 In August 2021, the State filed a petition for adjudication of wardship alleging that J.N. was a neglected and/or abused minor due primarily to domestic violence. For example, the petition recounted that the Illinois Department of Children and Family Services (DCFS) received information that (1) respondent hit his children with boards, belts, and cords, (2) Antonia's paramour pulled a gun on her in front of J.N., and (3) respondent's paramour attempted to run respondent over with a car. According to the petition, in 2019, J.N.'s family had been subject to an intact services case due to an indicated allegation that X.N. sexually abused his younger sister, G.N.

¶ 6 In February 2022, the trial court entered an adjudicatory order determining that J.N. was at a substantial risk of physical abuse and his environment was injurious to his welfare. In March 2022, the court entered a dispositional order making J.N. a ward of the court, finding that respondent was an unfit parent because he was not cooperating with services or contacting his caseworker. The court granted DCFS custody and guardianship of J.N. and set the goal as return home within 12 months.

¶ 7 The trial court held nine permanency reviews between June 2022 and October 2024. Those orders show that in early 2024, the court changed J.N.'s goal to private guardianship. Around that same time, X.N. and E.N. moved back into respondent's home, and the court later terminated wardship as to X.N.

¶ 8 In October 2024, the State filed a petition to terminate respondent's parental rights to J.N. The State alleged that respondent failed to make reasonable efforts or progress between (1) February 7, 2022, and November 7, 2022, (2) November 7, 2022, and August 7, 2023,

(3) August 7, 2023, and May 7, 2024, and (4) May 7, 2024, and the "present." See 750 ILCS 50/1(D)(m)(i)-(ii) (West 2024).

¶ 9        The State also petitioned to terminate respondent's parental rights to G.N. The trial court held joint proceedings on the State's two petitions.

¶ 10                              A. The Unfitness Hearing

¶ 11        The unfitness hearing proceeded on March 24, 2025. At the State's request, the trial court took judicial notice of (1) the original neglect/abuse petition, (2) the adjudicatory order, (3) the dispositional order, and (4) "the various permanency hearings since then," which apparently means the orders following the permanency reviews. The State then presented testimony from Alexander Campbell and Jennifer Spohr, both of whom worked for DCFS.

¶ 12        Because J.N. had a different mother than the other children, DCFS personnel prepared service plans in J.N.'s case and a separate set in his half-siblings' cases. Campbell discussed respondent's progress and efforts under (1) a service plan dated January 2, 2024, that was prepared in connection with DCFS's file for J.N.'s case (covering the period of July through December 2023) and (2) a service plan dated February 12, 2024, that was prepared in connection with DCFS's file for X.N.'s, E.N.'s, and G.N.'s cases (covering the period of September 2023 to February 2024). In those service plans, DCFS personnel indicated that respondent was working successfully toward all tasks.

¶ 13        Spohr testified about respondent's progress and efforts under service plans dated August 12, 2024, and February 11, 2025, both of which were prepared in connection with DCFS's files for X.N.'s, E.N.'s, and G.N.'s cases. In the August 12, 2024, service plan, DCFS personnel rated respondent satisfactory as to most of his tasks but raised some concerns about his lack of cooperation with a case supervisor. However, in the February 11, 2025, plan, DCFS personnel

rated respondent unsatisfactory as to all tasks due to lack of cooperation and communication.

¶ 14　　　　The testimony and exhibits admitted at the unfitness hearing collectively showed the following. By early 2024, respondent was employed and rented a two-bedroom home that met minimal parenting standards. He completed the evaluations required of him and participated in recommended follow-up services. Although it took a long time, respondent had progressed to the point where both X.N. and E.N.—who were 18 and 15 years old, respectively—returned to his care.

¶ 15　　　　Despite J.N.'s brothers returning home, J.N. remained in foster care. Throughout this case, respondent's visitation with J.N. generally alternated between supervised or "partially unsupervised." By early 2024, respondent agreed that the goal for nine-year-old J.N. should be to pursue private guardianship in the foster home where he had resided since November 2022. Due to that goal change, subsequent service plans that DCFS personnel prepared in connection with J.N.'s case did not outline any tasks for respondent to complete.

¶ 16　　　　There was never any real prospect of G.N. returning to respondent's care. X.N. had sexually abused G.N., so DCFS could not safely place those siblings in respondent's home together. Aside from that complication, G.N. exhibited severe behavioral and mental health problems that required long-term inpatient treatment starting in May 2024. DCFS personnel expressed concerns that respondent failed to understand the trauma that X.N. caused G.N., as respondent denied that anything happened and became aggressive during meetings when DCFS staff brought up the issue. Respondent's visitation with G.N. was always supervised.

¶ 17　　　　At times, DCFS personnel expressed concern that respondent was quick to anger, extremely argumentative, and would belittle DCFS staff. In the latter half of 2024, respondent stopped cooperating with DCFS personnel completely. He stopped attending meetings, declined

to update his caseworker about his circumstances, and refused to allow DCFS personnel to come to his property unaccompanied by law enforcement. As a result of respondent's behavior, DCFS personnel rated respondent unsatisfactory in all respects on the final service plan that was prepared in connection with G.N.'s case before the unfitness hearing.

¶ 18 In explaining its ruling at the unfitness hearing, the trial court focused on July 2023 through February 2025, which was the period covered by the four service plans in evidence. The court acknowledged that respondent contacted and cooperated with caseworkers for "a good part of that time" and participated in services. However, the court noted that respondent's visits with J.N. and G.N. "were always either supervised *** or partially supervised" and had occasionally been suspended. The court also recognized that "[d]uring the most recent period of time," respondent's cooperation with DCFS personnel "dropped off substantially." The court further considered that, between July 2023 and February 2025, respondent never had overnight visits with J.N. or G.N., nor was there ever any recommendation for respondent to regain custody of them. In the court's view, although respondent participated in some services and made some efforts, that did not translate into reasonable progress. Ultimately, the court determined that respondent failed to make reasonable efforts or progress toward the return of either J.N. or G.N.

¶ 19 B. The Best-Interests Hearing

¶ 20 The matter proceeded to a best-interests hearing on April 15, 2025. Respondent does not challenge the trial court's findings in connection with that hearing, so we need not detail the evidence. It will suffice to say that the testimony showed G.N. required long-term treatment in a residential facility, whereas J.N. was thriving with his foster parents, who "signed a permanency commitment agreement." The court found that it was in the best interests of both G.N. and J.N. to terminate respondent's parental rights.

¶ 21　　　　　Respondent timely appealed in both G.N.'s case and J.N.'s case. We later granted respondent's motion to dismiss his appeal in G.N.'s case.

¶ 22　　　　　　　　　　　　　　II. ANALYSIS

¶ 23　　　　　　　　　　　A. Delay in Filing This Disposition

¶ 24　　　　　The deadline for filing our disposition was September 15, 2025. See Ill. S. Ct. R. 311(a)(5) (eff. July 1, 2018) (establishing that, absent a showing of good cause, the appellate court must issue its decision in a child-custody appeal within 150 days of the filing of the notice of appeal). Circumstances arose during this appeal that prevented us from meeting the deadline.

¶ 25　　　　　In the original appellant's brief, respondent challenged the sufficiency of the evidence supporting the unfitness finding, even though the record on appeal contained no report of proceedings. Rather than citing the record, respondent improperly cited a copy of a transcript of the unfitness hearing that he included in the appendix to his brief. The State filed an appellee's brief that did not address the merits of respondent's argument but urged us to affirm the judgment due to the absence of a proper record. See *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984) (explaining that where an appellant does not provide a complete record of the proceedings to support a claim of error, the reviewing court presumes that the challenged order conformed with the law and had a sufficient factual basis).

¶ 26　　　　　On July 28, 2025, we entered an order striking the parties' briefs and directing respondent's appellate counsel to supplement the record with transcripts of the unfitness hearing and the best-interests hearing. We also ordered the parties to rebrief the appeal with a proper record. We explained our rationale for this order: "To safeguard respondent's due process rights and ensure that he receives effective assistance of appellate counsel, we determine it would not be appropriate or in the interests of justice to affirm the judgment terminating respondent's parental

rights on the rule of *Foutch* alone, in this instance, under these circumstances."

¶ 27 In accordance with our order, the parties rebriefed the appeal. Respondent filed his amended reply brief on September 19, 2025, after the deadline imposed by Rule 311(a)(5) had passed. Due to these circumstances, there is good cause for the delay in filing this disposition.

¶ 28 B. Respondent's Challenge to the Unfitness Finding

¶ 29 Respondent argues that the trial court's finding of unfitness was against the manifest weight of the evidence. Respondent reasons that he was rated satisfactory on all tasks in the service plan dated January 2, 2024, which was the only plan introduced into evidence that dealt specifically with J.N.'s case. He notes that Campbell's testimony confirmed his satisfactory progress during that time period. Respondent then asserts that Spohr "did not testify directly as to [respondent's] efforts and progress toward the return home of J.N.," but rather "focused on a separate, related case involving *** G.N." Respondent submits that the State's case for terminating his parental rights as to J.N. "was seemingly but an afterthought" to the State's case with respect to G.N.

¶ 30 The State maintains that it proved respondent's unfitness by clear and convincing evidence because respondent "failed to make reasonable progress from May 7, 2024, through February 7, 2025." According to the State, the evidence about respondent's failure to cooperate during that time period applied both to G.N.'s case and J.N.'s case.

¶ 31 In his reply brief, respondent emphasizes that the State did not introduce a service plan in connection with J.N.'s case for the period spanning May 7, 2024, through February 7, 2025. Respondent also asserts that the testimony did not address his "progress in line with the goals set forth in such service plan for this final nine-month period." Respondent maintains that on appeal, the State improperly relies on evidence pertaining to G.N.'s case to "bridge the gap created by the

- 7 -

omission of this necessary evidence."

¶ 32    Involuntary termination of parental rights is a two-step process. *In re J.H.*, 2020 IL App (4th) 200150, ¶ 67. The State must first prove by clear and convincing evidence that the parent is unfit under any single ground listed in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2024)). *J.H.*, 2020 IL App (4th) 200150, ¶ 67. If the parent is unfit, the matter proceeds to a second hearing, at which the State must prove by a preponderance of the evidence that it is in the best interests of the minor to terminate parental rights. *J.H.*, 2020 IL App (4th) 200150, ¶ 67. We will not disturb a finding of unfitness unless it is against the manifest weight of the evidence. *J.H.*, 2020 IL App (4th) 200150, ¶ 68. "A finding is against the manifest weight of the evidence only if the evidence clearly calls for the opposite finding [citation], such that no reasonable person could arrive at the circuit court's finding on the basis of the evidence in the record." (Internal quotation marks omitted.) *J.H.*, 2020 IL App (4th) 200150, ¶ 68.

¶ 33    Here, the State's petition alleged that respondent failed to make reasonable efforts or progress during four specified periods. See 750 ILCS 50/1(D)(m)(i)-(ii) (West 2024) (providing that a parent is unfit if, during any nine-month period after the adjudication of neglect, he or she fails to make (1) "reasonable efforts to correct the conditions that were the basis for the removal of the child from the parent" or (2) "reasonable progress toward the return of the child to the parent"). The trial court found that respondent failed to make either reasonable efforts or progress at any point between July 2023 and February 2025, which was the period on which the State focused at the hearing on the petition. We may affirm the judgment if the evidence supports any ground on which the court found respondent unfit. See *J.H.*, 2020 IL App (4th) 200150, ¶ 74. We choose to focus on respondent's progress between May 7, 2024, and February 7, 2025.

¶ 34    As this court recently explained:

"Reasonable progress, which is assessed under an objective standard, exists when a parent's compliance with the service plan and the trial court's directives is sufficiently demonstrable and of such a quality that the court, in the *near future*, will be able to order the child returned to parental custody. (Emphasis in original.) [Citation.] A parent fails to make reasonable progress toward the return of the child when the parent fails to substantially fulfill his or her obligations under the service plan and correct the conditions that brought the child into care. [Citation.] Importantly, there is a significant difference between going through the motions, checking off the boxes, and mechanically doing what is asked of the parent and actually changing the circumstances that brought the children into care. [Citation.] A finding of unfitness is appropriate if the court will not be able to return the child home in the near future, despite ample time and opportunity for compliance with the court's directives." (Internal quotation marks omitted.) *In re Baby Boy*, 2025 IL App (4th) 241427, ¶ 65.

¶ 35 We hold that the evidence supports the trial court's finding that respondent failed to make reasonable progress between May 7, 2024, and February 7, 2025. In early 2024, X.N. and E.N. returned to respondent's care, and respondent agreed to pursue private guardianship as a goal for J.N. Later in the year, respondent stopped cooperating with and became hostile toward DCFS personnel. He failed to provide updates about his circumstances, and he would not allow the caseworker to visit his home without a police escort. These were not the actions of a person who was making reasonable progress toward having J.N. returned to his care. After the adjudication of neglect, respondent had three years to work toward the return of his children, during which time the court conducted nine permanency reviews. The evidence amply supported the court's finding

that, despite making some efforts to participate in services over the years, respondent did not make reasonable progress toward the return of J.N. during the last time period alleged in the State's termination petition.

¶ 36   Respondent argues that the only evidence proving his noncooperation during the relevant time frame pertained to G.N.'s case, not J.N.'s. Respondent's position is unpersuasive, as the children's cases were interconnected. DCFS personnel prepared separate service plans for J.N.'s case because he had a different mother than the other children involved in care. Campbell testified that because J.N.'s goal changed to guardianship after January 2024, subsequent service plans prepared in connection with J.N.'s case outlined no tasks for respondent to complete. Thus, the State introduced subsequent service plans that were prepared in connection with G.N.'s case, which detailed respondent's failure to cooperate and communicate with DCFS in the later portion of 2024 and early 2025. Spohr also testified about respondent's lack of cooperation and communication during that time period. The evidence that respondent agreed to pursue private guardianship for J.N. and then stopped cooperating and communicating with DCFS personnel is sufficient to support the trial court's finding that respondent failed to make reasonable progress toward J.N.'s return home. Contrary to what respondent argues, terminating his parental rights to J.N. was not an "afterthought" to terminating respondent's rights to G.N.

¶ 37                    III. CONCLUSION

¶ 38   For the reasons stated, we affirm the trial court's judgment.

¶ 39   Affirmed.